Bryan D. NELSON, a minor, by John D. Hibbard, Guardian ad Litem, Paul M. Gustafson and Ann M. Gustafson, Plaintiffs-Appellants,

v.

NELSON HARDWARE, INC., and Hartford Casualty Insurance Company, Defendants-Third Party Plaintiffs-Respondents-Petitioners,

David D. NELSON and State Farm Fire & Casualty Company, Third Party Defendants.

Supreme Court

*No. 89–1099–FT. Argued November 27, 1990.—Decided April 3, 1991.*

(Also reported in 467 N.W.2d 518.)

For the plaintiffs-appellants there was a brief by Eric J. Wahl and *Wiley, Rasmus, Wahl, Colbert, Norseng & Cray, S.C.*, Eau Claire and oral argument by *Eric J. Wahl.*

For the defendants-third party plaintiffs-respondents-petitioners there was a brief by *Susan M. Zabel* and *Coe, Dalrymple, Heathman & Coe, S.C.*, Rice Lake and oral argument by *Ms. Zabel.*

Amicus curiae brief was filed by *Virginia M. Antoine* and *Habush, Habush & Davis*, Milwaukee for Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed by *Paul R. Norman, Bonnie A. Wendorff* and *Boardman, Suhr, Curry & Field*, Madison for Wisconsin Automobile & Truck Dealers Assoc., Wisconsin Farm Equipment Assoc., Wisconsin Merchants Federation, Inc., Wisconsin Retail

Gasoline & Automotive Trade Assoc. and Wisconsin Retail Hardware Assoc.

HEFFERNAN, CHIEF JUSTICE. This is a review of a published court of appeals decision[1] reversing the summary judgment of the circuit court for Barron county, James C. Eaton, circuit judge, dismissing the complaint of the plaintiff Bryan D. Nelson against the defendant Nelson Hardware, Inc.,[2] sounding in products liability and negligence. The court of appeals remanded for further proceedings.

The plaintiff injured his hand when a used shotgun purchased from the defendant store accidently discharged when the gun fell to the ground. The trial court granted summary judgment to the defendant, ruling that the defendant hardware store, as a seller of used merchandise, as a matter of law, was not subject to strict liability under sec. 402A, Restatement (Second) of Torts (1965), and that there were no genuine issues of material fact on the negligence issue. The court of appeals reversed on both issues, holding that sellers of used products can be held strictly liable and that a genuine factual dispute existed as to the store's negligence. We affirm the court of appeals, which remanded for further proceedings.

The facts in respect to the injury are, for the most part, not in dispute and are as follows:

Nelson, age fourteen, injured his hand while hunting pigeons and sparrows with a Stevens twenty-gauge model 940E single-shot shotgun. After Nelson observed

---

[1] *Nelson v. Nelson Hardware, Inc.*, 153 Wis. 2d 218, 450 N.W.2d 491 (Ct. App. 1989).

[2] The plaintiff is not related to the defendant hardware store although they have the same last name. *See Nelson*, 153 Wis. 2d at 220 n.1.

a pigeon fly into a barn, he placed a shell in the chamber, entered the barn, and began climbing a ladder with the gun in his hand to reach the loft. The shotgun was uncocked. When Nelson approached the loft, he reached up and placed the shotgun in a leaning position on a board against the ladder. As he continued climbing, the gun slipped and fell butt-first to the barn floor and discharged into his hand.

The shotgun was manufactured by Savage Industries, Inc., sometime during the 1970's. According to Mark Nelson, the owner of Nelson's True Value Hardware Store, he took this weapon in trade from a third party on September 5, 1982, and had visually inspected it at that time but found no apparent defects. The gun appeared to be in good condition. It remained in the possession of the hardware store until it was sold to the plaintiff's father on October 13, 1983. No alterations, changes, or modifications of any type were made to the gun while in the possession of Nelson True Value Hardware. At no time was Mark Nelson ever informed by Savage Industries through a notice of recall, alert, or warning, or by the previous owner that there was a defect in the Stevens Model 940E 20-gauge shotgun. In fact, the latent defect had gone undiscovered.

Nelson's True Value Hardware store was engaged in the business of selling a wide variety of retail merchandise. From 1977 to January 1986, it sold new guns and took used guns in trade when selling new guns and, as the facts in the instant case reveal, later sold used guns that had been taken in trade. The store was never a dealer or distributor of products manufactured by Savage Industries.

Initially, Bryan brought an action in strict liability and negligence against Savage Industries, Inc., the manufacturer of the allegedly defective Stevens shotgun.

Savage brought a third-party complaint against Bryan's father, alleging causal negligence. Sometime thereafter, Savage filed for Chapter 11 reorganization under the Federal Bankruptcy Act. The plaintiff then amended his complaint by bringing an action against the Nelson Hardware store and its insurer. Plaintiff alleged:

> Nelson Hardware, Inc. was negligent in the marketing and distribution of said shotgun. Further, said shotgun, at the time it was sold, was in a defective condition so as to be unreasonably dangerous when it left the possession and control of defendant Nelson Hardware, Inc. and said shotgun remained in this defective and unreasonably dangerous condition at the time of the above accident.

The defendant hardware store moved for summary judgment based on its manager's affidavit that it sold guns and took used guns in trade, that it had taken the Savage shotgun in trade and had later sold it in 1983 to Bryan's father.[3] The manager's affidavit stated that an inspection had been made when the shotgun was taken in trade in 1982 and no defects were apparent. He also stated that he made no assertions or representations concerning the safety of the gun when he made the sale to the father and, in respect to the allegations of negligence, stated that there were no factual averments of any negligent conduct whatsoever, only the statement that the store "was negligent in the marketing and distribution of said shotgun." Moreover, defendant denied any knowledge of any defect in the shotgun and asserted that no alteration was made to the shotgun while it was in the possession of the hardware store.

[3]Savage Industries was dismissed as a party defendant on November 1, 1988. Accordingly, the manufacturer is not a present party to this lawsuit.

The counter-affidavit on behalf of plaintiff Bryan acknowledged that no alteration had been made in the weapon while it was in possession of the store, but, due to a design defect, that it was defective and unreasonably dangerous when manufactured and was in that condition when the hardware store sold it to Bryan's father. The plaintiff's father stated that he asked Mark Nelson "whether or not [the gun] would be a good beginning gun for his boy . . . meaning whether or not it was in good working order since it was a used shotgun," to which question, he averred, he received an affirmative answer. The plaintiff's father believes he paid between $65 and $80 for the gun.

Referring to a deposition of a firearms expert, the plaintiff's affidavit stated that the examination of the weapon revealed that the shotgun would fire every time it was dropped on its butt from a distance of as little as ten inches, despite the fact the weapon was not cocked and was set in a safety mode. The affidavit incorporated the statement of the expert that the weapon as sold was "unreasonably dangerous," was design defective, and was in the same condition as originally manufactured.

The plaintiff, in response to defendant's motion to dismiss, asserted that the seller, Nelson Hardware, Inc., came within the provisions of sec. 402A, Restatement (Second) of Torts, which this court adopted in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967).

Defendant hardware store countered by arguing that the Wisconsin Supreme Court had never found sec. 402A to be applicable to a seller of used goods, and in *Burrows v. Follett & Leach, Inc.,* 115 Wis. 2d 272, 340 N.W.2d 485 (1983), affirmed a trial court's refusal to instruct a jury on strict liability in a case involving the sale of a used chattel.

The trial court in this case found *Burrows, supra,* to be dispositive and flatly held, without exception or condition, that strict liability does not lie against the seller of a used product.

In respect to the claim that the hardware store was negligent, the trial court noted that the movant store, in its affidavit, stated that an inspection had been made and that there were no apparent defects. Because the plaintiff offered no counter-affidavits in respect to the nature of the inspection, the trial court concluded that the quality of the inspection was not put in issue. The court also noted that no facts were alleged in the complaint or referred to in the plaintiff's counter-affidavits that would furnish an evidentiary basis for the complaint's assertion that the hardware store was negligent in the marketing and distribution of the shotgun.

Accordingly, the trial court granted summary judgment to the defendant dismissing the plaintiff's complaint. On appeal from that judgment, the court of appeals reversed, stating:

> We note the plain language of sec. 402A does not limit itself to new products but applies to "any product." Also, policy reasons that justify strict liability are equally applicable here.

153 Wis. 2d at 224.

In respect to the allegation of negligence, the court of appeals also reversed. It reasoned that:

> Whether the hardware store breached its duty to inspect is dependent on numerous factors not sufficiently developed by affidavit to conclude that no genuine dispute of material fact exists. These factors include whether the seller made representations concerning the product, whether the inspection was adequate for the purpose for which it was undertaken,

and whether a reasonable inspection would have revealed the defect. [Citation omitted.] Also disputed is whether the hardware store made representations in the course of marketing the gun.

153 Wis. 2d at 226.

As we view the last stated ground for reversal, the court of appeals addresses the question of whether or not any representations were made and, further, questions if the representation asserted by Bryan's father was indeed made, whether that representation by the store had the effect of impliedly asserting that an adequate inspection for safety had been made. The court of appeals in effect stated that the reasonable import or the meaning a reasonable person would ascribe to the representation, if made, must be resolved by the finder of fact, and, hence, there was a material issue of fact that remained to be tried.

The hardware store and its insurer have petitioned for, and have been granted, review in this court.

We first address the question whether a products liability claim, first sanctioned by this court in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967), applies to a used product which otherwise meets the criteria for strict liability set forth in sec. 402A, Restatement (Second) of Torts. We hold that a claim for products liability may be brought under circumstances alleged in this case where the defective condition causing harm to the consumer of the used product arises out of the original manufacturing process and where other elements requisite for liability under sec. 402A are present.

The circuit court, in view of its understanding of this court's opinion in *Burrows v. Follett & Leach, Inc.,* 115 Wis. 2d 272, 340 N.W.2d 485 (1983), held that this court had decided that the *Dippel* rule of products liability had no applicability to used products; hence, the trial

court found it unnecessary to re-examine the underlying rationale of *Dippel* or of sec. 402A in respect to their applicability to used products that would be subject to the rule were they sold new.

The trial court assumed, erroneously we conclude, that the "precedent" established by this court in *Burrows* made a detailed analysis of the question unnecessary.

Judge Eaton in his opinion stated:

> There are profound factual similarities to the *Burrows* case in this one. So profound, in fact, that the Court cannot see under these facts, any possibility of a verdict submission under Section 402A.

The factual similarities relied upon by the trial court were that the shotgun in this case, like the machine in *Burrows,* was "old," that both were used, not new products, that neither in *Burrows* nor in the instant case was the seller to the consumer "in the business of buying used equipment nor [in the instant case] was it a regular purveyor of the Savage line."

Judge Eaton then went on to recognize that:

> Admittedly, the dangerous aspect of the shotgun, namely its design, was not open and in plain view; and it was indisputably undetectable by the buyer.

He did not comment on the facts that made *Burrows* clearly distinguishable from the facts in this case—that the defect in the *Burrows* machine was in "plain view" and "[t]he dangers of a rapidly rotating drive shaft are obvious and well-known." *Burrows,* 115 Wis. 2d at 285.

The court of appeals in this case reversed for several reasons. One reason given, a reason in itself sufficient to remove the *Burrows* machine from sec. 402A coverage, was based on that distinction:

699

Because the dangers of the corn picker [in *Burrows*] . . . were readily apparent to the user, the corn picker would not have been unreasonably dangerous . . ..

153 Wis. 2d at 223.

■

Accordingly, the court of appeals made it clear that, even were the corn picker new, its condition did not come under the rubric of sec. 402A. As pointed out by this court, for a product to be in a defective and unreasonably dangerous condition under sec. 402A, it must be found to be a hidden, and not an obvious, defect. *See Sumnicht v. Toyota Motor Sales,* 121 Wis. 2d 338, 369, 360 N.W.2d 2 (1984).

The *Burrows* court specifically found the fact that the danger was in plain view and obvious to be reason enough for not applying sec. 402A. Thus, whether or not the corn picker was "used," the machine did not have an unreasonably dangerous defect cognizable under sec. 402A. Even were the *Burrows* machine new, sec. 402A would have been inapplicable.

While this court in *Burrows* obviously recognized that the machine was used, it never held, or even in dicta stated, that the purchaser of a used article was precluded from sec. 402A protection by that fact alone.[4]

---

[4]Other reasons given by the *Burrows* court were that there was no express representation as to safety. While this may be a compelling reason to find no liability for a breach of warranty or representation, it is clear that the *Burrows* court did not intend to make the presence or absence of a representation relevant to a claim for products liability under sec. 402A. Section 402A was specifically devised to obviate the need for warranties or representation where the purchase is from a seller engaged in the business of selling such a product. *See* sec. 402A Comment *m,* par. 3, p. 355. *See also* Comment *b* to sec. 402B, p. 359.

The *Burrows* court, by stating, "We conclude that strict liability under sec. 402A is not appropriate in this case," made the outcome fact-specific without making the question of sec. 402A liability dependent upon whether the product was new or used. Whether or not sec. 402A applies to used goods, under any circumstances, otherwise subject to the rationale of *Dippel v. Sciano,* remains a question not heretofore decided by this court.

The conclusion of the court of appeals that sec. 402A is applicable is clearly correct. The wording of sec. 402A, the policy for the rule as set forth in the Restatement commentary, and the explication of the reason for sec. 402A and the policy explanation set forth at length in *Dippel v. Sciano* impel our conclusion that the buyers of used goods are not precluded from the protection of sec. 402A simply because the product is not purchased new.

Section 402A of the Restatement provides:

### § 402A.   Special Liability of Seller of Product for Physical Harm to User or Consumer

(1)   One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a)   the seller is engaged in the business of selling such a product, and

---

Other reasons were given also to deny any liability, but none of them are expressly predicated on the simplistic premise that products liability cannot apply to used products.

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The court in *Dippel* restated the requirements of sec. 402A, which it adopted, in the following words:

From a reading of the plain language of the rule, the plaintiff must prove (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

37 Wis. 2d at 460.

Significantly, sec. 402A, which we adopted in *Dippel,* did not exclude used products from its embrace. The words employed are "(1) One who sells any product . . .." It is thus apparent that *any* seller "if . . . engaged in the business of selling such a product,"—*any* product—is included. There are no exclusions based upon

whether the product has previously been sold to a consumer. The potential liability attaches to one who sells any product if, in accordance with conditions of sec. 402A(1)(a), the seller "engaged in the business" of such selling.

It is argued, however, that Nelson Hardware store was not a seller within the definition of sec. 402A(1)(a), because the store had never been a dealer or a distributor of Savage firearms. We conclude this assertion misses the plain meaning of sec. 402A(1)(a), which refers not at all to particular brand selling, but only to "such" a product. The allegations and affidavits make it clear that firearms were sold by Nelson Hardware and used firearms were purchased and then resold, as was the case here. Whether Savage brand firearms were sold on a regular basis by Nelson as a dealer in Savage firearms is irrelevant under the Restatement rule. Nelson sold firearms; the particular shotgun was "such a product."

Comment *f*, page 350, to sec. 402A, captioned *Business of selling*, makes clear that the rule applies to one in the business of selling, but does not apply to one "who is not engaged in that activity as a part of his business." Only the occasional nonbusiness seller is excluded—for example, the housewife who sells her neighbor a pound of sugar or an individual who sells his personal automobile to another. It is worthy of note that the Restatement does not exonerate the seller of a personal automobile from the strictures of sec. 402A because the product he sells is used, but because his sale is not in the course of the business of selling such products.

Here it is obvious beyond dispute that the acceptance of used firearms in trade and then subsequent resale is part and parcel of Nelson Hardware's business of trad-

703

ing in new and used firearms. Selling used firearms under any reasonable interpretation of the pleadings and affidavits was a part of its business.

The public policy for liability for one doing business in the sale of a product is set forth in Comment *f,* sec. 402A, page 351:

> The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence.

Because it is apparent that used goods sold by one in the "business of selling" are covered by sec. 402A, it is not necessary to restate the policy factors that justified sec. 402A as adopted by this court in *Dippel v. Sciano.* We need not reinvent or restate in detail the rationale for strict liability.[5] The rationale is identical whether

---

[5]We agree, however, with the policy rationale set forth by the court of appeals. *Nelson v. Nelson Hardware,* 153 Wis. 2d 218, 224-25, 450 N.W.2d 491. That court stated:

The three often cited justifications for the rule of strict liability for defective products are: "Compensation (ability to spread the risk), satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product)." *Burrows,* 115 Wis. 2d at 281, 340 N.W.2d at 490 (quoting *Fulbright v. Klamath Gas Co.,* 533 P.2d 316, 321 (Or. 1975)).

These three reasons justify applying sec. 402A to this case. It has been observed that "[d]ealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured

applied to new or used goods.

We do, however, for emphasis, restate the basic premises of *Dippel* relied upon by this court in *Burrows v. Follett & Leach, Inc.,* 115 Wis. 2d 272, 273, 340 N.W.2d 485 (1983), and even more recently in *Kemp v. Miller,* 154 Wis. 2d 538, 550-51, 453 N.W.2d 872 (1990):

> The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices. He may protect himself either by purchasing insurance or by a form of self-insurance. In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who creates the risk by placing the defective product on the market. A correlative consideration, where the manufacturer is concerned, is that the manufacturer has the greatest ability to control the risk created by his product since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer.

*Dippel v. Sciano,* 37 Wis. 2d at 450-51.[6]

---

parties and the allocation of the cost of injuries caused by the products they sell . . .." *Id.* at 281, 340 N.W.2d at 490 (quoting *Tillman v. Vance Equip. Co.,* 596 P.2d 1299, 1303 (1979)). Also, there is evidence that the defective safety mechanism belied the reasonable expectations of the user in that the gun "will unexpectedly fire when dropped on the butt from a distance of only ten inches while uncocked and in the safety mode." And, although the chances of indemnity from a manufacturer may be diluted in the case of used goods due to the passage of time, a manufacturer would continue to be liable on an indemnification theory, which would create an impetus to manufacture a safer product.

[6] It should be noted that the original justification of strict

The general policy reasons for the imposition of strict liability on a seller of goods—new or used—are as set forth in sec. 402A of the Restatement. These policy factors include the ability to compensate the injured

liability in *Dippel* made clear that one basis for strict liability on a manufacturer was separate and apart from the basis for holding a seller liable. Hence, it is fallacious to say that there should be no recourse in strict liability against the seller, Nelson Hardware, because holding Nelson liable does not impose the same pressures on the manufacturer as would be the case where the action was brought against, and continued directly against, the manufacturer. The reason for liability on Nelson Hardware is because it is the seller which is in the best position to distribute the costs of the risk created by the defective product it has sold. That there may be indemnity by a retailer against a manufacturer, which in turn imposes liability on a manufacturer and this, in turn, encourages the manufacturer to make a safer product is purely serendipitous when the retail seller is held liable. While there is an incremental benefit in terms of public policy by conceivably correcting manufacturers' errors, that additional point is almost irrelevant, when viewed from a plaintiff's point of view, to the imposition of strict liability on one who sells a dangerously defective product to a consumer.

Strict products liability is imposed upon manufacturers without regard to their care in producing goods. It is enough under sec. 402A that a product in a defective condition unreasonably dangerous to a user or consumer has been put into the stream of commerce. It is obviously satisfying to society's sense of rectitude to hold liable the manufacturer, the party responsible for the defect, but a seller is held responsible on an entirely different rationale. A seller is liable even though completely innocent or completely uninvolved in creating the defect. *See* sec. 402A Restatement, Comment *c*, page 349, which sets forth the policy reasons why a seller is appropriately held responsible in strict liability irrespective of any relation to a manufacturer and quite apart from any common law theories of indemnity.

706

party by the seller being able to spread the risk by insurance or indemnity which is inherent in selling products which may cause injury to a purchaser, who has a reasonable expectation that the product is safe for the intended use; and the risk reduction aspect is always present, since imposition of liability may impel a retail seller to purchase only from other sellers or manufacturers who, under threat of liability as a matter of law, will correct or prevent the manufacture of dangerously defective products.[7]

Thus, we conclude that this court's decision in *Burrows v. Follett & Leach,* 115 Wis. 2d 272, 340 N.W.2d 485 (1983), does not preclude the imposition of strict liability merely because the dangerously defective product is a "used" product. We also conclude that, from a policy standpoint, the route this court took in *Dippel v.*

---

[7]It is argued that because Nelson Hardware never had a direct relationship with Savage, this latter policy factor is irrelevant. That it is not is demonstrated by the ability of Nelson in this case to seek indemnity against Savage even though it had never dealt with Savage. The argument made harks back to a now supplanted idea that there must be privity between the manufacturer and the seller. It is irrelevant from a legal policy standpoint that Savage is undergoing a reorganization under the bankruptcy laws. The liability of a seller who is otherwise responsible ought not, at the expense of an injured party, be determined by whether indemnity is in fact available.

Also, the mere holding of a retailer liable for the sale of a firearm that had its origin as being dangerously defective when it left the manufacturer is bound to motivate a weapons manufacturer to avoid producing a defective product. Whether or not Nelson had a course of dealing with Savage is immaterial to Nelson's liability. Moreover, all manufacturers of firearms will be induced to manufacture better products. A judgment in this case would constitute a signal to all weapons manufacturers.

*Sciano* in 1964 is not only consistent with applying strict products liability to a used product but impels the application of sec. 402A if other factors are present—the factors that would impose liability in the same circumstances were the product new. We do, however, limit our holding to the facts alleged in this case, where the seller of the used product is in the business of selling as defined in sec. 402A and where the defective condition causing harm to the consumer or user arises out of the original manufacturing process.

Accordingly, we agree with the court of appeals conclusion that it was error as a matter of law to grant summary judgment for the defendant seller on the sole ground that the product was used and that sec. 402A and the principles of *Dippel v. Sciano* did not apply.

Having concluded that the grant of summary judgment was the result of an error of law, it remains for the trial court to determine whether summary judgment should nevertheless be granted on factual grounds, *i.e.,* that there has not been a proper allegation of the necessary elements for proof of strict liability or of negligence or whether, if the allegations are sufficient, in the absence of any disputed material facts, judgment should be granted to the plaintiff or the defendant.

The sufficiency of the allegations under a strict liability claim is not at issue—only the legal question of whether strict liability applied to an unreasonably dangerous defective used product under the facts of this case. It would appear, moreover, that the factual allegations of negligence are sufficient to satisfy the initial threshold which any complaint must surmount to state a claim. The complaint broadly alleged that Nelson Hardware was negligent in the marketing and distribution of

708

the defective shotgun. Clearly, under the philosophy of our statutes (*see* sec. 802.02, Stats., and *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis. 2d 723, 731, 275 N.W.2d 660 (1979)) which allow and indeed encourage notice pleading, the allegations permit proof of specific acts of negligence which may be encompassed within the allegations of misconduct (*i.e.,* negligent conduct) in the course of marketing and distributing of the weapon.

The court of appeals identified those possible acts of negligence that are in dispute: A negligent misrepresentation of the safety of the weapon, whether the "inspection" of the gun by the seller was done in the exercise of due care, and whether a due care reasonable examination in any event would have revealed the defect. Also, of course, and clearly disputed, is whether the seller made any representation whatsoever. We hasten to add, however, that these items of negligence become largely irrelevant if, in the course of further proceedings, it is determined that sec. 402A, as limited by our holding herein, applies in this particular instance, *i.e.,* are the elements of strict liability alleged proved to a trier of fact.

There remains, however, one negligence issue that must be determined although all the elements of strict liability are proved. That issue is whether Bryan Nelson, the user of the arguably defective shotgun, was negligent in the use of the gun at the time the injury occurred. Under this court's formulation of products liability, the contributory negligence of the consumer or injured party may be used to reduce damages that might otherwise be awarded. *Dippel v. Sciano,* 37 Wis. 2d at 461.

Thus, numerous factual issues remain to be decided. Summary judgment is not appropriate for either party at this stage of the proceedings. We hold, under circumstances alleged in this case where the defective condition

709

causing harm to the consumer of the used product arises out of the original manufacturing process and where other elements requisite for liability under sec. 402A are present, a claim for products liability may be brought. "New" or "used" is not a sole criterion for the application of products liability under the rationale of *Dippel v. Sciano.*

*By the Court.*—Decision of the court of appeals is affirmed.

STEINMETZ, J. (concurring). This court should not make the doctrine of strict products liability applicable to sellers of used products. Also, it is clear under the facts of this case that the new rule of law created by the majority should not be applied against the defendant hardware store. The real upshot of the majority opinion will be to harm those individuals who, often as a matter of necessity, rely upon the used goods market for their consumer goods purchases. Moreover, many individuals employed in the used goods sector will be hurt by the majority opinion. However, as to the alleged negligence of the defendant, I agree with the majority that there remain certain issues of fact that need to be tried.

The majority's decision concerning the applicability of the doctrine of strict liability is entirely inconsistent with precedent and the policies which heretofore have defined Wisconsin products liability law. To illustrate, I need only refer to our recent decision in *Rolph v. EBI Cos.,* 159 Wis. 2d 518, 529, 464 N.W.2d 667 (1991). In *Rolph,* we held as a matter of law that a reconditioner of a used machine is not subject to strict liability in tort for defects in the machine. We stated that our objective in the area of strict products liability is to:

> impos[e] the risk of loss associated with the use of defective products on the party that created and

710

assumed the risk, reaped the profit by placing it in the stream of commerce, impliedly represented that the product was safe and fit for use by placing it in the stream of commerce, and had the ability to implement procedures to avoid the distribution of defective products in the future.

*citing Kemp v. Miller,* 154 Wis. 2d 538, 556–57, 453 N.W.2d 872 (1990). This policy rationale simply does not support application of the doctrine of strict liability to used product sellers, and we stated so in *Kemp.*[1]

In *Kemp,* we held that a commercial lessor could be held strictly liable for product defects that arise at or subsequent to manufacture or design. Specifically with regard to sellers of used goods, however, we said that:

[T]he imposition of strict liability on a seller of used products, for defects that arise after manufacture and before the product reaches the seller,[2] places the risk of loss associated with the use of the defective products on one who has neither created nor assumed the risk and on one who is not in a position to implement

---

[1] It makes no practical difference whatsoever that in *Rolph,* 159 Wis. 2d at 529–32, the defendant was said not to have "sold" the product in question and not to have "placed [it] into the stream of commerce." *Rolph* rests on its underlying policy justifications, not on the fact that, in a particular manner of speaking, Busch could be said not to have introduced the product at issue into the stream of commerce. An objective reading of *Rolph* shows that in reaching our decision we attached no absolute significance to the "stream of commerce" distinction but rather related the defendant's actions to the policy considerations at stake.

[2] It is irrelevant that in the case at bar the alleged defect is considered one that occurred at, and not subsequent to, design or manufacture. What matters in the case at bar is that the defect arose before the product came into the used seller's possession.

procedures to avoid the distribution of defective products in the future. Defects in a used product typically arise before the product reaches the seller and while the product was in the hands of an unknown previous owner. The used product seller is rarely familiar with the prior history of the products he or she sells and can discover and correct latent defects in those products only at great cost by means of individual inspection.

*Id.*

*Kemp,* referred specifically to *Burrows v. Follett & Leach,* 115 Wis. 2d 272, 340 N.W.2d 485 (1983), in which we held as a matter of law that the seller of a used cornpicker was not subject to the doctrine of strict product liability where a product defect that occurred subsequent to design and manufacture was obvious at the time of the second-hand sale. The holding of *Burrows* and the language of *Kemp* should be applicable to used sellers generally.

By definition, a used product seller such as the defendant hardware store, does not "create" the risk. The risk has resulted from a defect that occurred before the product ever reached the seller. Nor does a used product seller "assume" the risk. The idea of assumption of the risk involves the parties' reasonable expectations surrounding the sale. As we explained in *Kemp,* "the used goods market generally operates on the understanding that the seller makes no particular assurance as to quality simply by offering a product for sale." 154 Wis. 2d at 557, *citing Tillman v. Vance Equipment Co.,* 286 Or. 747, 755, 596 P.2d 1299, 1303 (1979). As another court has stated, a reasonable buyer of a used product does not expect to pay the price of a new product and cannot expect the quality and warranties available with the purchase of a new product. *Rix v. Reeves,* 23 Ariz.

App. 243, 532 P.2d 185 (1975). Where a reasonable buyer of a used product has no particular expectations of product quality,[3] it simply cannot be said that the used product seller "assumes" any risk. Thus, having neither created nor assumed any risk, a used product seller should not be subject to the doctrine of strict product liability.

In addition, as we stated in *Kemp,* a used product seller normally is not in a position to avoid distribution of defective used goods in the future. It is the product designer or manufacturer that is primarily responsible for the distribution of any product defective in design or manufacture. A used product seller typically has no formal or direct relationship with the designer or manufacturer of the used product. It thus has no ready channel of communication by which it might exchange information with a designer or manufacturer as to any danger or defect related to the product which might be neutralized or corrected by design or manufacturing modification. Moreover, unlike a commercial lessor such as in *Kemp,* a used product seller such as the defendant hardware store typically has not gained a high degree of familiarity with the product such as results to a commercial lessor from numerous dealings with the same particular kind of product over an extended period.

Moreover, as we noted in *Kemp,* a used product seller can discover and correct latent defects in its products only at great cost by means of individual inspection.

---

[3] A reasonable buyer's expectations of quality are even lower where the product he is purchasing is relatively old and outmoded. In the instant case, a reasonable buyer would have seriously contemplated the fact that the firearm in question was at least ten years old when offered for sale by the defendant hardware store and that later model firearms incorporating design and manufacturing advances in product safety might be worth any corresponding higher purchase price.

713

As a rule, used product sellers such as the defendant do not have what *Kemp,* 154 Wis. 2d at 555, referred to as "the physical facilities and the technical competence and expertise" on hand that is necessary to discover and correct latent defects. As a result of the preoccupation with possible latent defects essentially now required of used goods sellers by the majority, the price of used goods surely will rise. In addition, the time necessary to carry out such individual inspections for product defects will deprive the used goods markets of desirable fluidity and flexibility. *See* J. Vargo, Products Liability Practice Guide, § 8.03(2) at 8–30 (1990).

The majority would apparently assert that used goods sellers should simply purchase insurance coverage against possible strict product liability claims that might be brought against such sellers. This "solution" fails to recognize that the ability of an enterprise to insure itself is predicated on the availability of insurance. The majority position would assume such insurance is available and affordable. There is no clear basis for such an assumption. In fact, there is strong evidence to the contrary.[4]

[4]Many insurance companies, in response to heavy losses, are cutting back on the areas of coverage they are willing to extend to consumers. *See generally Insurance Giants no Longer Ask to be All Things to All People,* N.Y. Times, Feb. 7, 1991, at 1, col. 1. In particular, because of product liability tort litigation, many insurance enterprises have been driven from the market. *See* Smith and Cuzmanes, *Insurance Protection—Product Liability,* 40 Food Drug Cosm. L.J. 112, 125 (1985). In 1984 and 1985 alone, at least forty liability insurers became insolvent, and more recent trends indicate difficulties for those that remain. R. Berger, *The Impact of Tort Law Development on Insurance: The Availability/ Affordability Crisis and Its Potential Solutions,* 37 Am. U.L. Rev. 285, 315–318 (1988). Indeed, in significant part because of an exponentially increasing number of products liability suits and

Where product liability insurance is available, its cost will be higher to used product sellers because of the majority's decision. Many used product sellers may not have the financial wherewithal needed to purchase the insurance. Assuming they can afford insurance, it will obviously increase their cost of doing business. Those sellers who will face the brunt of the unfavorable impact of the majority's decision are those who are least able to absorb and pass on the increased cost of doing business. Specifically, the majority decision will have an adverse impact on used product sellers which operate on a non-profit basis and which therefore cannot absorb the higher costs.

Generally, insofar as the majority decision increases their cost of doing business, used product sellers will pass

increasing awards associated with them, the very viability of private insurance as a staple of the tort system's compensation function has been called into question. *Id.* at 315–16.

As Berger has recognized, enterprises and their insurers do not "have the ability to 'spread the risk' indefinitely." Berger at 288. Berger notes:

> In fact, there [are] certain limits to the ability of the tort system to function as a societal insurance mechanism. Limits are established, in reality, by the nature of the mechanism upon which insurance itself is predicated: risk must be predictable and be spread among a very large, generally homogenous group of insurance units that incur loss responsibility independently of each other.

*Id.*

Today, and for the foreseeable future, the risks facing used product sellers are anything but predictable. Nobody knows for example, if and when this court will extend the doctrine of strict products liability to situations where the defect in the used product occurs subsequent to design or manufacture. Nobody knows if and when this court will extend the doctrine of strict products liability to consignment sellers. There being no predictability and certainty, products liability insurance will be in shorter supply.

on those higher costs to their customers in the form of higher prices. I submit that many if not most of those customers are individuals who have relatively low disposable incomes and who, because of the low prices of used goods relative to new goods, tend to choose used goods when purchasing basic household necessities. These people, who are already at some disadvantage in terms of being able to purchase their basic needs in the marketplace, will suffer disproportionately greatly as a result of the majority decision because they will have to pay higher prices for the goods they buy.[5]

The increased prices of used goods, in turn, will make those goods less attractive to potential purchasers, who will be encouraged to prefer new goods, all other things equal. Thus, those organizations which primarily sell used goods will be particularly hard hit; as their customers move to the new goods market; many may be induced to close down their operations entirely. As a result, at least some employees of stores selling used products will be in serious risk of losing their jobs. Again, it is those already disadvantaged in society who will suffer disproportionately as a result of the majority decision.[6]

---

[5]Moreover, the less affluent, in addition to making more of their purchases in the used goods market, are less likely than the relatively more affluent of society to bring a successful strict product liability action and reap any direct benefit from the majority decision.

[6]Goodwill stores, for example, employ handicapped people to repair used goods for sale in their stores. *See generally,* Yastine, *Recycling: Watching Our Wastelines,* Southwest Florida Business Journal, Dec. 1989, at 6. In certain sales regions, the number of handicapped people employed by Goodwill stores runs well into the hundreds. *See generally,* Becker, D. *Who Needs Goodwill? Many of Your Neighbors,* Washington Post, June 15, 1989, at

In rural areas in particular, entire communities will be hurt to the extent that stores such as the defendant hardware store, which by dabbling in used goods arguably presents as much a service to the remote community as it does a source of revenue to the owner, cut back their operations. In fact, even such "dabbling" often means the difference to such stores in being able to stay afloat as a business. The result of the majority decision may well be to push marginally profitable but societally useful enterprises over the cliff. Such organizations may consider it no longer worth the risk and effort required to stay in business.[7]

To the extent trade in used goods continues, it will increasingly tend to take place on a private and individual basis through, for example, the classified advertisements of local newspapers. Indeed, the used goods trade may flourish within such an informal market. Insofar as transactions in this informal market go unreported to the authorities, unfavorable tax revenue consequences are likely to result to state and local units of government. Moreover, it is possible if not likely that the goods that private individuals sell will be more defective, and hence

---

M2. In Wisconsin, individuals similarly situated will be in jeopardy of losing their jobs as a result of the decreased demand for used goods caused by the majority opinion.

[7]The majority decision contributes to something of a "vicious circle" for used product sellers: There are already not a large number of enterprises which are in the business of selling used goods in general and used firearms in particular. In light of the majority's decision, there will be even fewer sellers of such used goods to comprise the sort of large and independent group of insureds that make up the sort of "homogenous group" necessary for a viable insurance market. Berger at 312. Without there being a viable insurance market, any remaining sellers of used goods will be further encouraged to throw in the towel.

717

more dangerous, than the used goods that enterprises such as the defendant's formerly sold. *See* P. Huber, Liability: The Legal Revolution and Its Consequences 165 (1988).

Furthermore, insofar as concerns of fairness remain important, it is worth noting that there is little opportunity for most used product sellers to "spread the risk" by means of indemnification against the designer and manufacturer of a defective product. *See Sukljian v. Charles Ross & Son Co.,* 499 N.Y.S.2d 466 (App. Div. 1986).[8] With respect to the case at bar in particular, there was no indemnification agreement between the defendant and the designer and manufacturer of the shotgun, Savage Industries. Moreover, Savage Industries is in a Chapter 11 bankruptcy proceeding and is not a party to this action. At oral argument of this case, it was stated that, at best, any claim by the defendant against Savage might be paid at a few cents to the dollar.

The majority's decision is at odds with the view of most other jurisdictions of the country. *See* J. Vargo, Products Liability Practice Guide, § 8.03(2) at 8–29. *See, e.g., Tillman; Rix; Wilkinson v. Hicks,* 126 Cal. App. 3d 515, 179 Cal. Rptr. 5 (1981); *Sukljian,* 499 N.Y.S.2d 466; *Sell v. Bertsch & Co.,* 577 F. Supp. 1393 (D. Kan. 1984); *Masker v. Smith,* 405 So. 2d 432 (Fla. Dist. Ct. App. 1981); *Pridgett v. Jackson Iron & Metal Co.,* 253 So. 2d 837 (Miss. 1971). As these cases indicate, the economic result of the majority's decision will be fewer sellers of

---

[8]The practical difficulty of indemnification from the manufacturer has prompted some commentators to declare in absolute terms that "used product retailers cannot recover against manufacturers and would bear the entire cost if strict liability were imposed on them." *See* C. Ausness, *Strict Liability for Chattel Leasing,* 48 Univ. Pitt. L.R. 273, 334 (1987).

used goods; those that remain will raise the prices of the used goods they have for sale.

Even assuming that there is some legitimate policy rationale upon which to make sellers of used products subject to the doctrine of strict products liability, the doctrine should not be applied in this particular case. We based our conclusion in *Rolph* on the language of Restatement (Second) of Torts, sec. 402A (1965), adopted in Wisconsin in *Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967), in which this court held that a seller of a product in a defective condition unreasonably dangerous to the user could be liable in strict tort. In *Dippel,* we set forth the following elements as necessary for a defendant to be subject to a strict product liability claim:

> [T]he plaintiff must prove (1) that the product was in a defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when he sold it.

There is nothing to indicate that the defendant sold firearms—let alone *used* ones—as anything related to a principal part of its business. Rather, the transaction in the case at bar was an "isolated or infrequent transaction" as that term was used in *Dippel.* The defendant evidently did not even stock new firearms in its store. Instead, it would procure the particular new firearms

719

desired by its customers through catalog orders. Occasionally, the defendant would take used firearms in trade. The fact that the used firearm at issue in the instant case was not purchased by anyone until well over a year after it was taken in trade by the defendant when the plaintiff purchased it, is strong evidence of the fact that the defendant's transactions in used firearms were "isolated" and "infrequent" and thus that the defendant should not be subject to strict liability in tort in the instant case. Under the facts of this case, the defendant was not a "seller of a defective product unreasonably dangerous to the user" as that term is used in *Dippel.*[9] The plaintiff has not met his burden of alleging facts necessary to show otherwise.

Indeed, sentimentally, one cannot argue with the outcome of the majority decision insofar as it will favor the plaintiff who has suffered an injury. However, I

---

[9]This court could also hold as a matter of law that the plaintiff has failed to allege a "defect" that rendered the ten-year-old shotgun "unreasonably dangerous" to the user that was a substantial cause of the injury. The "defect" alleged to have been present in the shotgun was "identified" by plaintiff's expert witness by dropping the shotgun from distances of from four to 12 feet. When thrown down on its butt from such distances, the shotgun discharged into the air, although the safety was on. I would submit that this does not show a defect. It certainly does not show one that is unreasonably dangerous. The shotgun, after all, was a firearm the use of which involved gunpowder, the volatility and explosiveness of which is well known. It is not unreasonable to figure that gunpowder will explode when a gun containing it falls from unsafe heights. The force of the impact from the plaintiff's dropping of the gun onto the hard cement floor of the barn quite naturally destabilized the gunpowder. The majority might as well argue that the alleged "defect" in the gun sold by Nelson Hardware was that it was not immune to the force of gravity and impact.

believe that doctrinally and in policy terms the majority decision with regard to the issue of strict liability is without merit.[10]

With respect to the question of negligence, I agree with the majority that there are material issues of fact that remain unresolved concerning the actions of the defendant hardware store. While as a matter of law the inspection of the firearm made by the defendant hardware store was made in the exercise of due care[11] and was not unreasonable and even a reasonable examination would not have revealed the gun's "defect," there is a disputed question of fact as to whether the defendant hardware store representative made any representation as to the gun's safety and whether any misrepresentation constituted negligence on the part of the hardware store employee. This issue must be tried.

I concur in only the result reached by the majority to remand the case to the trial court but not with its reasoning.

---

[10]In the final analysis, the majority would use the civil justice system to provide overall social welfare. Underlying any interest the majority may have in this regard might be the fact that, over the past decade, social welfare benefits in the United States have been largely frozen and in some cases diminished. G. Priest, *Strict Products Liability: The Original Intent,* 39 Defense L.J. 279, 280 (1990).

[11]Reasonably, was a Nelson Hardware employee expected to test the shotgun as plaintiffs' expert did, *i.e.,* by dropping it from a height of 12 feet to see if the safety worked or the gun fired unexpectedly?