**Bill Loyd HARBER and Lucinda Earlene Harber, Plaintiffs,**

v.

**ALTEC INDUSTRIES, INC., Defendant.**

**No. 91–5057–CV–SW–8.**

United States District Court,
W.D. Missouri,
Southwestern Division.

Feb. 16, 1993.

Richard L. Anderson, Kimberling City, MO, for plaintiffs.

Gary Cunningham, Daniel Clampett Law Firm, Springfield, IL, Mary Anne Mellow, Sandberg, Phoenix & von Gontard, P.C., St. Louis, MO, for defendant.

### ORDER

STEVENS, Chief Judge.

This matter is before the court on defendant's motion for summary judgment.

### FACTS

This case concerns the sale and the subsequent failure of a utility truck with an aerial lift bucket. The uncontested facts

are as follows. On April 30, 1989, defendants sold to a wholly-owned company of plaintiffs a 1975 Ford Model F750 truck equipped with a Utility Model DOP 37 derrick assembly and a fiberglass aerial lift bucket. Plaintiffs concede that defendant did not manufacture or design the aerial bucket. The parties agree that the truck was sold "AS IS" and that defendant disclaimed all warranties in a section of the sale contract. That section provides:

## EXCLUSION OF WARRANTIES

Buyer purchases the goods sold hereunder AS IS and with all faults and buyer recognizes that there are no warranties of seller which extend beyond the description of the goods sold on the face hereof. Seller hereby disclaims any warranties, expressed or implied, of merchantability of the goods sold hereunder or of fitness for the particular purpose for which such goods are to be used by buyer. Buyer acknowledges that he has examined such goods as fully as buyer desired.

Contract Attached to Defendant's Motion for Summary Judgment as Exhibit B. Defendant originally acquired the truck and bucket as a trade-in. Defendant did not inspect, repair or modify the equipment before its sale. On September 6, 1989, plaintiff Bill Harber was working in the aerial bucket, which was in an elevated position. The bucket then sheared away from the derrick arm and fell to the ground, injuring Harber. Plaintiffs sued defendant in the Circuit Court for Stone County, alleging three counts. The first count alleges strict liability, while the second and third counts allege a breach of warranty. Defendant removed the case to this court, and now moves the court for summary judgment.

## SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Facts must be viewed in the light most favorable to the nonmoving party, who must be given the benefit of all reasonable inferences which may be made from the facts disclosed in the record. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Raschick v. Prudent Supply, Inc.*, 830 F.2d 1497, 1499 (8th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

If a party is unable to make a sufficient showing as to some essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the non-moving party's case is lacking, *Id.* The burden then shifts to the non-moving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is not currently available. *Id.;* Fed.R.Civ.P. 56(e). If the nonmoving party fails to so respond, summary judgment, if appropriate, shall be entered against such party. Fed.R.Civ.P. 56(e). The standard for determining whether a factual dispute is genuine is the same as the standard applied to motions for a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The nonmoving party must come forward with sufficient evidence to allow a reasonable jury to find in its favor. *Id.* at 251, 106 S.Ct. at 2511–12.

## DISCLAIMER OF WARRANTIES

Assuming plaintiffs have stated causes of action in counts II and III for breaches of warranty,[1] the court must ne-

---

**1.** Plaintiffs do not name the specific warranties allegedly breached, but the use of the wordings "knew or should have known of the use," and

"not fit for the use," suggests that plaintiffs meant to plead breach of the warranties of

vertheless grant defendant's motion as to those counts. Missouri law expressly allows a seller to disclaim the warranty of merchantability and the warranty of fitness for a particular purpose. Mo.Rev. Stat. § 400.2–316. In order to exclude the implied warranty of merchantability successfully, the contract of sale must state specifically and conspicuously that the warranty of *merchantability* is being disclaimed. Under Mo.Rev.Stat. § 400.2–102, such a notice is "conspicuous" when "it is so written that a reasonable person against whom it is to operate ought to have noticed it...." Even when viewed in the light most favorable to the plaintiff, the disclaimer in the April 30, 1989, contract of sale is conspicuous as a matter of law. The contract reads "Seller hereby disclaims any warranties, expressed or implied, of merchantability of the goods sold hereunder...." There are no allegations that this language was buried or was inconspicuous.

The Missouri statute also provides that a seller may disclaim any warranty for fitness for a particular purpose by stating that "there are no warranties which extend beyond the description on the face hereof." Defendant met that standard in the *EXCLUSION OF WARRANTIES* section of the contract. Defendant even specifically excluded any warranty of "fitness for the particular purpose for which such goods are to be used by buyer." Defendants have come forward with a clear showing that essential elements of both causes of action are missing. Plaintiffs, in their response, do concede that defendant disclaimed all warranties. Therefore, defendant is entitled to judgment as a matter of law on counts II and III.

## STRICT LIABILITY FOR A DEALER IN USED GOODS

For their first count, plaintiffs allege strict products liability. Plaintiffs claim the following to support that cause of action:

merchantability and fitness for a particular pur-

1. Defendant was a dealer in goods of like kind (new and used trucks with bucket assemblies);
2. The bucket was defective and unreasonably dangerous when first manufactured;
3. The defect continued in existence, and was in existence when the truck and bucket was sold to plaintiff's corporation;
4. The bucket was used in a manner reasonably anticipated and intended;
5. The defective and unreasonably dangerous condition produced injury to plaintiffs; and
6. The defective condition was hidden and could not have been discovered prior to the bucket's failure.

Plaintiff's Response to Defendant's Motion for Summary Judgment, at 2. Defendant argues that he is entitled to judgment as a matter of law because under Missouri law, a seller of used products cannot be held liable under strict liability since strict liability applies only to a designer, manufacturer or retailer of a product.

### Missouri Law

The question of whether a dealer in used goods may be liable under the doctrine of strict liability is undecided under Missouri law. *See Williams v. Nuckolls*, 644 S.W.2d 670, 674 n. 1 (Mo.Ct.App.1982) ("Because of the absence of evidence to support a finding of a defect at the time the automobile left the seller's hands, we do not reach the controversial question of the applicability of [Restatement of Torts (2d) ] § 402(a) to the sale of used cars."). The question has been ducked by other courts as well. *See, e.g., Grimes v. Axtell Ford Lincoln–Mercury*, 403 N.W.2d 781, 783 (Iowa 1987) (On certification from the Eighth Circuit Court of Appeals the Iowa Supreme Court declined to decide the question of strict liability for the seller of used goods, instead decided the case on the facts). Other jurisdictions have addressed this issue and there is no national consensus: states appear to be evenly split. *See* Allen E. Korpela, Annotation, *Strict Liability in Tort: Liability of Seller of Used*

pose.

*Product,* 53 A.L.R.3d 337 (1973 & Supp. 1992) (collecting cases); W. Page Keeton et al., *Prosser & Keeton on Torts,* § 100, at 704 n. 24 (5th ed. 1984 and supp. 1988); James A. Henderson, Jr. & Aaron D. Twerski, *A Proposed Revision of Section 402A of the Restatement (Second) of Torts,* 77 Cornell L.Rev. 1512, 1518–19 (1992) (imposing strict liability on dealers in sued goods is the minority rule). Therefore, this issue is one of first impression in Missouri and there is no clear national trend that guides our result.

Normally a Federal Court looks to established state law to decide legal issues in diversity cases, but where "the state law issue is a question of first impression, a federal district court judge must apply the law as he believes the state's highest court would declare it to be if it had the opportunity to do so." *Sell v. Bertsch & Co.,* 577 F.Supp. 1393, 1398 (D.Kan.1984). In making this analysis, this court may look to prior actions of the Missouri Supreme Court and the Missouri General Assembly, as well as decisions from other states.

The Missouri Supreme Court adopted the doctrine of strict liability in *Keener v. Dayton Elec. Manufacturing Co.,* 445 S.W.2d 362 (Mo.1969). The court specifically adopted the rule as set forth in the Restatement (Second) Torts § 402A:

(1) One who sells any product in a defective condition [un]reasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user . or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Keener,* 445 S.W.2d at 364. The court gave three reasons for adopting this rule. First, strict liability will "insure that the costs of injuries resulting from defective products are borne by the manufacturers [and sellers] that put such products on the market." *Id.* at 364. Second, using this doctrine would eliminate the confusion surrounding the use of warranty language to reach similar results. *Id.* And third, strict liability gives direction to products liability litigation. *Id.*

The Restatement (Second) of Torts, upon which the Missouri Supreme Court based its decision in *Keener* provides a more complete rationale for products liability:

On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c.

The Missouri Legislature has not addressed the issue of sellers of used goods either directly or indirectly, but its latest pronouncement on the issue of strict liability may be relevant to its intent. The legislature defined the term "products liability claim" in relation to a seller, the state of the art defense and contributory negligence:

The term "products liability claim" means a claim or portion of a claim in

which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

(Emphasis in original). Mo.Rev.Stat. § 537.760. The next section provides that a defendant "whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim" if another defendant, including the manufacturer, is before the court, and if full recovery may be had from the other defendants. Mo.Rev.Stat. § 537.-762. These new provisions seem to cast the net of strict liability very widely, attaching liability to any seller "in the stream" or "chain" of commerce. The plain language of this can be interpreted, as many courts do, to include *all* sellers of products—new and used.

However, the assumption underlying courts' usages of the broad term "chain" or "stream" of commerce is that the stream of commerce begins with the manufacture and ends with the sale to the first end-user. *See, e.g., Welkener v. Kirkwood Drug Store Co.,* 734 S.W.2d 233, 241 (Mo.Ct.App. 1987). This "chain" of commerce very well may be broken when the product is first sold to the consumer. Subsequent sales in the second-hand market may be outside of this chain. The usage of the term "chain of commerce" by the legislature should be looked at in the context of its usage by the courts.

Therefore, the court finds that the broad language of M.Rev.Stat. § 537.762 does not expressly include dealers in used goods and does not establish the intent of the legislature on the issue of strict liability for the dealer in used goods.

## OTHER JURISDICTIONS

Since the position of the Missouri Supreme Court on this issue is not discernible through case law or statutory language, this court will examine approaches used by the more widely cited cases from other states that have decided this issue.

### Dealers in Used Goods Not Strictly Liable

The Illinois Supreme Court was the first to address this issue. In *Peterson v. Lou Bachrodt Chevrolet Co.,* 61 Ill.2d 17, 329 N.E.2d 785 (1975), the court refused to impose strict liability on a used car dealer for defects that arose after its original manufacture because to do so would be to make the dealer an insurer for defects that arise while the car is under the control of others. The court found it decisive that the defect was not present when the car left the manufacturer.

The Oregon Supreme Court has been cited frequently for its thorough analysis of the issue in *Tillman v. Vance Equipment Co.,* 286 Or. 747, 596 P.2d 1299 (1979). In that case, a dealer who sold a used crane "AS IS" without making any repairs, inspection, or modifications was held not to be strictly liable. The court reviewed the justifications for strict liability—compensation to the injured party, satisfaction of the reasonable expectations of the user, and risk reduction through pressure to market a better product—and concluded that while used products dealers may be able to compensate those injured, the other two factors were not furthered by imposing liability. The court found that other factors weighed heavily against finding liability:

We conclude that holding every dealer in used goods responsible regardless of fault for injuries caused by defects in his goods would not only affect the prices of used goods; it would work a significant

change in the nature of used-goods markets. Those markets, generally speaking, operate on the apparent assumption that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion). The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.

We are of the opinion that the sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.

As to the risk reduction aspect of strict products liability, the position of the used-goods dealer is normally entirely outside the chain of distribution of the product. As a consequence, we conclude, any risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify our taking that step. The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and a manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.

*Tillman,* 596 P.2d at 1303.

In *Wilkinson v. Hicks,* 126 Cal.App.3d 515, 179 Cal.Rptr. 5 (1981), a dealer in used machinery who sold a defective 20–year–old punch press was not strictly liable. In facts similar to the case at bar, the dealer had about 20 other used presses, some of which were reconditioned, but most were sold "AS IS". The court considered several factors important in finding against strict liability: whether the dealer keeps product in stock; whether the dealer inspected, used, modified, or repaired the equipment; whether the dealer had any connection to the manufacturer; whether the dealer disclaimed any warranties; and whether the dealer had any facilities or employees to inspect repair or recondition. The court also examined several policy rationales behind strict liability. "To impose such liability would as a practical matter require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products. Such a rule would effect a radical change in the nature of the used product market, which would deprive that market of the desirable flexibility referred to in *Tauber–Arons* and *LaRosa.* It would in effect render used goods dealers as insurers against defects which came into existence after the original chain of distribution and while the product was under the control of previous consumers." *Id.* 179 Cal.Rptr. at 8. In *Tauber–Arons Auctioneers Co. v. Superior Court of Los Angeles County,* 101 Cal.App.3d 268, 161 Cal.Rptr. 789 (1980), one of the cases referred to in *Wilkinson,* an auction company was not held strictly liable for a defective product sold at auction, even though it was clearly a "seller."

In *Fuquay v. Revel Motors, Inc.,* 389 So.2d 1238 (Fla.Ct.App.1980), a used car dealer was sued under strict liability for a car that burst into flames after a rear-end collision. The complaint alleged that the design and placement of the gas tank was defective. The court held that the dealer was not strictly liable because the policy rationales for strict liability of placing the risk on the party who makes on profits from the car and improving the safety of the product, were not furthered by imposing liability in this case:

> In the present case appellee is a seller of used cars and has no responsibility for the placement of the automobile in the stream of commerce. A vendor so removed from the original marketing chain is unable to exert any significant influence on the manufacturer, and we agree

... that in such circumstances the vendor should not be liable, absent additional facts, for latent design defects in the product.

*Fuquay*, 389 So.2d at 1240 (*see also Masker v. Smith*, 405 So.2d 432, 434 (Fla.Ct.App. 1981) ("Imposing liability on the seller of used or second-hand goods for *latent* defects for which he is not responsible and which he could not discover by reasonable care would make such dealer a virtual insurer against every kind of defect.") (emphasis in original)).

In *Sell v. Bertsch & Co.*, 577 F.Supp. 1393 (D.Kan.1984), the district court was faced with the similar problem of having to decide whether a dealer in used goods may be held strictly liable, without the benefit of the state supreme court or legislature speaking to the issue. There, the court echoed the previously-discussed cases and found that imposing strict liability would not further the policy rationales underlying strict liability.

Dealers in Used Goods are Strictly Liable

In *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236 (App.1983), the court found that dealers in used goods may be held liable on an enterprise liability theory. The court held that the Restatement § 402A imposed liability on a "seller" and does not require that he be the first in the chain of sellers. *Id.* 660 P.2d at 1242. The court disagreed with the *Tillman* court's reasoning because they believed that a buyer from a dealer in used goods would not have an expectation that the good may be unreasonably dangerous. The court also reasoned that imposing strict liability would encourage risk reduction because the dealers would increase inspection and maintenance before sale. *Id.* at 1240. The court held that the proper method by which the court could take into account the situation of the dealer in used goods is by allowing the jury to weigh the circumstances of the dealer in making a determination whether the good is unreasonably dangerous. *Id.* at 1241.

The "unreasonably dangerous" analysis was first used in *Turner v. International Harvester Co.*, 133 N.J.Super. 277, 336 A.2d 62 (1975). There, the court also held that the dealer's location in the chain of distribution was a factor to be weighed by the jury in determining whether the product was "unreasonably dangerous."

In *Nelson v. Nelson Hardware, Inc.*, 160 Wis.2d 689, 467 N.W.2d 518 (1991), the Wisconsin Supreme Court held that a hardware store that sold a used shotgun could be held strictly liable where "the defective condition causing harm to the consumer of the used product arises out of the original manufacturing process and where the other requisites for liability under sec. 402 are present." *Id.* 467 N.W.2d at 521. The court held that since the hardware store accepted used firearms as trade-ins and then sold them, it was clearly a "seller" for the purposes of strict liability. The court held that the policy reasons underlying strict liability (risk reduction, compensation and liability spreading) weigh in favor of liability in the case of dealers in used goods.

Two commentators recently proposed a replacement for Restatement § 402A, but expressly declined to address the issue of used goods.

The liability of commercial sellers of used products has been widely debated in the courts. Every court agrees that such sellers are liable for their negligence, but whether they may be held strictly liable is disputed. A majority of courts take the position that imposing strict liability on commercial sellers of used products does not further the policies expressed in comment c. On this view, used product markets are open to such variation that consumers are better served by freeing the market of the strictures of strict liability. A minority of courts have held that imposing strict liability pressures such sellers to improve inspection of used goods before placing them on the market, thus enhancing the safety of such consumer goods. The rule stated in this section takes no position on this issue, leaving its resolution to developing case law.

James A. Henderson, Jr. & Aaron D. Twerski, *A Proposed Revision of Section 402A of the Restatement (Second) of Torts*, 77 Cornell L.Rev. 1512, 1518–19 (1992) (the authors are the reporters for the ALI's drafting of the Restatement (Third) of Torts. Their article is not a reflection of the views of the ALI).

## POLICY ANALYSIS

As the court noted above, the decisions of other jurisdictions are not in agreement on this issue. What they are in agreement on is that the issue should be analyzed with the goals of strict liability in mind. Therefore, this court finds that the Missouri Supreme Court would base its decision on this issue on an analysis of the policy rationales underlying strict liability. This court will identify those rationales and analyze them in light of the circumstances of this case. This court's analysis will be limited to a dealer in used goods who sells products "AS IS" and does not repair, modify or alter the product.[2] Once a dealer in used goods takes substantial steps to change the nature of the good sold, the justifications for imposing enhanced liability change markedly.

### Spreading the Risk

One rationale behind strict liability is that the cost of injuries resulting from defective products can best be borne by those who market these products irrespective of fault for the cause of the defect. *See* Restatement (Second) of Torts § 402A cmt. c. This not a "deep pocket" theory, but rather it recognizes that those in the distribution chain can shift the costs of such injuries to all consumers equally through increased prices. *See* W. Page Keeton et al., *Prosser & Keeton on Torts*, § 98, at 692–93 (5th ed. 1984).

This policy rationale works well with manufacturers and original sellers of products. With a new product, the price can be controlled from the manufacturer. At the beginning of the sales process, the manufacturer is able to add the extra costs to pay for future injuries caused by defective products. Under Missouri Law, a seller is entitled to indemnification from the manufacturer or may be dismissed from the lawsuit when the manufacturer is properly before the court. Mo.Rev.Stat. § 537.762. This reflects a judgment by the legislature that the manufacturer should bear the brunt of the risk whenever possible.

The manufacturer is in the best position to bear the risk because he can do it the most efficiently—he sets the original cost of the product and the extra cost of insuring the product against defects may be spread out among all the units manufactured. Retailers share in this efficient distribution of risk because of their connection to the manufacturers. The close relationship between the original distributors and retailers and the manufacturers allows them to share the risk of defective equipment with those above them in the chain. The first sellers in the chain of a product may negotiate costs with manufacturers

---

**2.** The court takes judicial notice that plaintiff's lawsuit against the original seller of the truck and the original manufacturer, styled *Harber v. Utility Body*, No. 87–5013–CV–SW–1, was dismissed because the defective bucket was added after it was first sold. *See Diamond v. Pitchess*, 411 F.2d 565, 568 (9th Cir.1969) (the court may take judicial notice of its own records). The fact that the bucket was not in the same condition as when it left the seller's hands defeats strict liability. Although the fact that the bucket was replaced after the original manufacture is not central to the court's analysis, it is relevant that other courts have based their determination of liability on whether the defect arose after it left the first seller's hands. In *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785, 787 (1975), the court found this factor to be central to its rejection of strict liability because

imposing liability here would make the used-goods dealer an insurer against every defect that could arise after manufacture. Likewise in *Wilkinson v. Hicks*, the court said, "It would in effect render used goods dealers as insurers against defects which came into existence after the original chain of distribution and while the product was under the control of consumers." 126 Cal.App.3d 515, 179 Cal.Rptr. 5, 8 (1981). And in *Nelson v. Nelson Hardware, Inc.*, 160 Wis.2d 689, 467 N.W.2d 518, 521 (1991), the court imposed liability, but only where "the defective condition causing harm to the consumer of the used good arises out of the original manufacturing process...."

In this situation, where the defect arose while the product was in the hands of the consumers, strict liability is even less desirable.

based on the increased risk they might bear. And since they sell a number of a product, they can spread the cost of risk-protection among all their sales.

The dealer in used goods, however, must bear the entire risk itself. There is no distribution chain throughout which it can share the liability. The only parties with whom the increased cost can be shared with are the consumers and the sellers of goods. Increasing the cost for consumers may drive the cost of used goods too close to the cost of new goods and drive the second-hand market out of business. If the cost of insuring the products is charged to the original owner of the goods who wishes to sell them, the lower price offered by the used-goods dealer may make it not worth their while to put the goods into the used goods market. Rather than sell for a lower price, the seller may decide to sell the goods himself. An exodus of goods from the used goods market would also shut businesses down. Shifting the cost of insurance for these goods to the sellers of used goods risks driving away the buyers or the suppliers, or both.

The goal of strict liability is not to put sellers out of business. It is to spread the risk to those who can afford it. Considering the size of many judgments, it may not be a question of spreading the cost of strict liability among customers or sellers; such judgments may close a seller down. Due to the passage of time before a product enters the second-hand market, there is more likelihood that a dealer in used goods will be the only seller or manufacturer that can be identified with the goods, and thus be left to defend the lawsuit (and pay any judgment) alone.[3] Or the defect in the goods may arise after the product leaves the initial stream of distribution, also leaving the dealer in used goods alone in the suit. Lawsuits that go after this type of seller usually come about because the other parties either have no money or can't be found. A dealer in used goods is rarely the

first choice for a defendant. There is a good chance that by the time a lawsuit works its way to this type of defendant, the dealer in used goods may be the only defendant left to pursue.

Not only are used goods dealers more likely to be alone in a lawsuit, they are less able to deal with a judgment. Dealers in used goods tend be much smaller operations than others in the chain of distribution and the large amounts awarded for an injury would bankrupt these smaller businesses if they are forced to pay a judgment alone.

In the present case, defendant is alone in the lawsuit. The manufacturer of the defective part is not known, and the manufacturer and seller of the original product have been judged not to be liable because the defect was not present when the equipment was manufactured originally. Defendant has no relation to the original stream of commerce, but is left to defend the suit on its own. In situations such as this, strict liability does not work to spread the risk to those who can afford it best. Instead, strict liability in this case will work to destroy the used-goods market. This rationale does not support imposing strict liability.

### Risk Reduction through Increased Inspection

The argument that imposing strict liability will increase the safety of such goods because the dealer will use increased care in inspecting and servicing the goods[4] is without merit in relation to latent defects, such as this one. By its very definition, a latent defect is one that "could not be discovered by reasonable care and inspection." Black's Law Dictionary 794 (5th ed. 1979). Even if a dealer in used goods were to inspect its products, latent defects would not be found and injuries would not be prevented. Defects could only be found through vigorous inspection and dismantling of the products, but that procedure

---

**3.** A seller may be dismissed from a products liability lawsuit if the manufacturer is properly before the court and if full judgment may be recovered without the seller. Mo.Rev.Stat. § 537.762.

**4.** *See Jordan v. Sunnyslope Appliance Propane Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236, 1240 (Ct.App.1983).

would dramatically change the used-goods market. Every dealer in used goods would be forced to become a reconditioner of products. Each product would have to be taken apart and rebuilt before sale to try to avoid liability. The cost imposed would be tremendous. The used-goods market would no longer be able to meet the needs of low-cost seeking consumers. Plaintiffs may have other remedies for discoverable defects under negligence, but imposing a rigorous duty of inspection under the aegis of strict liability would do little to prevent injuries from latent defects at the expense of the free-market nature of the used-goods market. *See Wilkinson v. Hicks,* 126 Cal.App.3d 515, 179 Cal.Rptr. 5, 8 (1981).

### Risk Reduction Market Pressure

Another policy rationale is that the seller of goods can exert pressure on the manufacturer to correct defective products and discourage their marketing. This argument, too, is ineffective when applied to dealers in used goods. In the normal chain of distribution, sellers or distributor have the opportunity to communicate with the manufacturer about the safety of the product. They can relay concerns and suggestions to the manufacturer either directly or through the manufacturer's sale force. Or a seller can send a message to the manufacturer to correct a defect by ceasing to purchase its goods. This kind of influence is possible precisely because the normal seller of new goods deals with a product on a regular basis and has the opportunity to observe its sales and communicate with its buyers. The normal seller has adequate means to receive information on a product and relay it to the manufacturer, and the dealer has the economic influence to effect change.

On the other hand, dealers in used goods do not have the influence, and rarely have the channels of communication. *Fuquay v. Revel Motors, Inc.,* 389 So.2d 1238, 1240 (Fla.Ct.App.1980). Dealers in used goods do not buy their stock from the manufacturer, or even from a distributor—the direct link to the producer is severed. *Tillman v. Vance Equipment Co.,* 286 Or. 747, 596 P.2d 1299, 1303 (1979). Their goods come by way of resales and trade-ins. In the present case, for instance, Altec received the truck as a trade-in on another vehicle. Oftentimes, the dealer in used goods has no idea how to contact the manufacturer and sometimes, as in this case, does not even know who the manufacturer was. Meaningful communication with the manufacturer is unlikely if not impossible.

In those circumstances where the dealer can actually communicate with the manufacturer, his voice will carry little weight. Manufacturers receive no direct economic benefit from the sale of second-hand goods—they only make their money on the initial sale. Instead, manufacturers lose prospective sales of new goods to cheaper, substitute, second-hand goods. A threat by a dealer in used goods to discontinue the sale of goods until defects are corrected would be a futile gesture. Furthermore, the second-hand market often receives products that are no longer manufactured. Any comments by a seller of discontinued goods would be of little use after the fact. In the present case, the truck was 10 years old and the manufacturer is unknown. A judgment against Altec would have no discernable corrective impact on the manufacturer of this product. This rationale weighs heavily against the imposition of strict liability.

### Consumer Expectations

Another rationale underlying strict liability is that consumers' reasonable expectations should be satisfied. Strict liability is based partly upon the idea "that the public has a right to and does expect ... that reputable sellers will stand behind their goods." *See* Restatement (Second) of Torts § 402A cmt. c. When a person buys a new product, it is reasonable to expect that it will serve its purpose satisfactorily: the product is sold direct from the factory and usually comes with warranties and guarantees. Strict liability is justified in these circumstances to ensure that the consumer gets what is promised.

Unlike a new products market, where assurances and guarantees are freely

made, the used market usually operates with no assurances and often, as was the case here, with affirmative disclaimers as to the quality of the goods. Such expectations of quality as are made in the new-goods market are not reasonable in the used-goods market[5] where *caveat emptor* is generally the rule. The used product market reflects free market forces at work. Buyers go to a used market to buy something for less or to buy something that is no longer on the new product market. In exchange for the lower price or a more desirable model, buyers are willing to sacrifice some of the assurances that come with new products. In other words, the buyer of used goods is willing to take his or her chances in exchange for a cheaper price.

One important product characteristic consumers of used goods are willing to forego is that of durability. Since a product has already been used, the useful life of a product presumably has been reduced. Consumers pay less because a used product may not last as long as a new one. Consumers also pay less because a product may not work as well as a new one, either because of wear and tear or improved technology.

For our purposes the most important fact is that when buying a used product, a consumer knows that for some reason, another consumer has chosen to sell what was once new. He or she may be selling it because he wants a new item or because it doesn't work as it should, but a purchaser of used goods is on notice that the used good was sold because it no longer met the seller's needs.

With these considerations in mind, the purchaser of used goods must have lower expectations of quality than a buyer of new goods. The buyer of used goods knows that there might be something "wrong" with the good—that is why it is being sold. And the better the deal, the more likely something is "wrong." If a consumer purchases a 19" color television set at a garage sale for $10 "AS IS" and with no assurance of quality, he or she should expect that the television set does not work and be pleasantly surprised if it does. Most used goods are worth what is paid for them; but consumers are willing to risk nonperformance in exchange for a good price.

Should a buyer of used goods desire more protection for the goods, that protection may be bargained for. *See Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299, 1303 (1979). The buyer may pay extra for a warranty or a right to return. In many retail situations, extended warranties or service contracts can be purchased to raise consumer expectations about the quality of a good.

Consumer expectations of used goods may change with the nature of the seller and the representations that the seller may make. Expectations for used goods may rise where there is no disclaimer, or there is some type of warranty or period for return. And where the product has been repaired, inspected or modified, the seller's liability should, and does, increase. *See Wilkinson v. Hicks*, 126 Cal.App.3d 515, 179 Cal.Rptr. 5, 8 (1981). In the event of a product failure in those circumstances, the buyer may have an action in negligence for faulty work or failure to inspect properly.[6]

The way the system now stands the consumer should be protected in relation to his expectations. In this case, the truck was bought for a good price "AS IS" and the seller did not inspect, repair or modify the product. The sale contract clearly stated that the buyer accepted the product "with all faults" and after having the opportunity to inspect. Defendants took careful and deliberate steps to disclaim all warranties pursuant to Missouri law and such disclaimers were legally effective. After such warranties are disclaimed, a buyer can have no reasonable expectations that the truck will operate flawlessly and without incident. Indeed, a purchaser should expect that something might go wrong. This

**5.** In particular, a market in goods that are not inspected, repaired or modified, and are sold "AS IS."

**6.** Or possibly, under circumstances not before this court, an action in strict liability.

case amply demonstrates that the consumer expectations in a used-goods market are considerably lower than that for new goods. Therefore, strict liability is not necessary to protect the lowered expectation of consumers.

### Preventing Waste

There is another policy peculiar to the used-goods market that weighs against strict liability. Used-goods markets serve the important function of preventing economic and resource waste. Many users of goods prefer to own newer, more advanced and better-performing products. When they decide to buy a new model or a replacement of an old product, there should be a place for the old product to go instead of the junk heap. In a free market, users will be free to either sell directly to another user or sell to a dealer in used goods. By selling to a dealer in used goods, the party can save time and energy and maybe get a better price (assuming it is profitable for resellers to exist). If strict liability is imposed on resellers for defective goods, the existence of a second-hand market will be threatened because dealers may not want to risk the tremendous and unpredictable expense that strict liability would impose. Without the second-hand market, the original buyers will be forced to waste time and money by selling the item themselves,[7] or waste the product by junking it. Either is an inefficient allocation of resources.

### VICTIM COMPENSATION

The overriding purpose of "products liability law, essentially, is to socialize the losses caused by defective products." *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 241 (Mo.Ct.App.1987), *quoting Lippard v. Houdaille Indus., Inc.*, 715 S.W.2d 491, 492 (Mo. banc 1986). The most important purpose of this "socialization of losses" is that innocent victims should be compensated. Strict liability was created to compensate victims in situations where traditional common-law claims in warranty and negligence would not work.

This rationale applies equally in relation to a dealer in used goods. In this case, for instance, plaintiffs have tried, and failed, to recover from the original manufacturer and seller. If Altec is allowed to escape liability, the victim will be denied recovery for his injuries from anyone connected with the product that caused the injury. Since dealers in used goods are often defendants of last resort, removing them from strict liability may prevent many innocent victims from recovering. This factor weighs in favor of strict liability.

### CONCLUSION

The court finds that the factors justifying strict liability in other situations do not warrant imposition of strict liability for a dealer in used goods. The only policy rationale that is served by imposing liability in these circumstances is that innocent victims will be compensated. Although this is an important goal of our tort system, it is not the only goal. *See Keener v. Dayton Elec. Manufacturing Co.*, 445 S.W.2d 362, 364 (Mo.1969). The tort system is based on the "fundamental principal of fairness." *Welkener*, 734 S.W.2d at 240. Fairness in strict liability is not served by imposing strict liability here. A policy with CERCLA-like tentacles of liability used against these dealers will not improve the manufacture of the goods and will not prevent latent defects from being passed on to consumers. Consumer expectations are already being met in the used-goods market. Furthermore, the dealers in used goods are not well situated to bear the cost of insuring the goods they sell. Imposing strict liability here would risk destroying one of the few truly free markets left. The policy rationales weigh heavily against strict liability in the circumstances in this case.

Based on the discussion above, this court finds that the Missouri Supreme Court would not extend strict liability to include to sellers of used goods who perform no maintenance, modification or repair on the used product and who successfully disclaim

---

**7.** Occasional sellers are not strictly liable for defective goods. Restatement (Second) of Torts

§ 402A(1)(a).

**966**

all warranties of title. Consequently, the court finds that defendant is entitled to judgment as a matter of law on Count I. All three of plaintiff's counts, therefore, do not state viable causes of action against this defendant.

For all of these reasons it is

ORDERED that defendant's motion for summary judgment is GRANTED as to all counts.