Leonard BURROWS and Margaret Burrows,
Plaintiffs-Appellants,

v.

FOLLETT & LEACH, INC., Defendant-Respondent.

Supreme Court

*No. 82–416. Argued October 4, 1983.—*
*Decided November 30, 1983.*

(Also reported in 340 N.W.2d 485.)

For the plaintiffs-appellants there was a brief by *John M. Potter* and *Brazeau, Potter, Wefel & Nettesheim,* Wisconsin Rapids, and oral argument by *John M. Potter.*

For the defendant-respondent there was a brief by *Donald M. Lieb, Donald P. Schneider* and *Otjen & Van Ert, S.C.,* Milwaukee, and oral argument by *Mr. Lieb.*

Amicus curiae brief was filed by *Randall E. Reinhardt* and *Warshafsky, Rotter, Tarnoff, Gesler & Reinhardt, S.C.,* Milwaukee, for the Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed by *Paul R. Norman* and *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.,* Madison, for Wisconsin Automobile & Truck Dealers

Association, Inc., Wisconsin Farm Equipment Association, Inc., and Wisconsin Motorcycle Dealers Association.

DAY, J. This is an appeal from a judgment and order dismissing the plaintiff's complaint in a personal injury action. There are three questions on appeal: (1) Did the trial court err in refusing to give Wisconsin Jury Instruction-Civil 3260[1] on strict liability tort; (2)

[1] "3260 *STRICT LIABILITY: DUTY OF MANUFACTURER TO ULTIMATE USER.* A Manufacturer of a product who sells (places on the market) a defective product which is unreasonably dangerous to the user or consumer, or to his property, and which is expected to and does reach the user or consumer without substantial change in the condition in which it is sold, is regarded by law as negligent even though he has exercised all possible care in the preparation and sale of the product, provided the product was being used for the purpose for which it was designed and intended to be used.

"A product is said to be defective when it is not reasonably fit for the ordinary purposes for which such product was sold and intended to be used, and the defect arose out of design, manufacture, or inspection while the article was in the control of the manufacturer. A defective product is unreasonably dangerous to the user or consumer when it is dangerous to an extent beyond which would be contemplated by the ordinary user (consumer) possessing the knowledge of the product's characteristics which were common to the community.

"A manufacturer is not under a duty to manufacture a product which is absolutely free from all possible harm to every individual. (A manufacturer is also not under an absolute duty to give special warning against remote possibilities of harm in the use or consumption of his product).

"It is the duty of the manufacturer not to place upon the market a defective product which is unreasonably dangerous to the user (consumer).

"Before you can answer the first question yes, that (name of product) was defective so as to be unreasonably dangerous, you must be satisfied by the greater weight of credible evidence to a reasonable certainty that: (1) The product was in a defective condition; (2) The defective condition made the product

Did the trial court err in refusing to permit plaintiff's counsel to make an offer of proof by questioning plaintiff as to how he obtained information he gave to an insurance adjuster about the accident; and (3) Is the plaintiff entitled to a new trial in the interest of justice. Because we conclude that there was no error in the court's rulings and that justice does not require a new trial, we affirm the order of the trial court dismissing the complaint.

The plaintiff-appellant (plaintiff), Leonard Burrows, was seriously injured when he became caught in the power take-off[2] shaft of a corn picker purchased used from defendant-respondent (defendant), Follett and Leach, Inc.[3] The plaintiff's complaint alleged three counts: one for negligence, one for strict liability in tort, and one for breach of express and implied warranties. The case was tried on December 2 and 3, 1981, and submitted to the jury on the negligence claim only. The jury returned a verdict finding the defendant twelve percent negligent and the plaintiff eighty-eight percent contributorily negligent. The trial court denied plaintiff's motion for a new trial and granted defendant's

unreasonably dangerous to persons or property; (3) The defective condition of the product existed when the product was under the control of the manufacturer; and (4) The product reached the user (consumer) without substantial change in the condition in which it was sold."

[2] A power take-off shaft is a drive shaft used to transmit power from the tractor to another piece of machinery—in this case a corn picker.

[3] Margaret Burrows, wife of Leonard Burrows, was also a plaintiff in the action seeking damages for loss of consortium. The complaint also named Dolly Madison Industries, Inc., Insurance Company of North America, and White Farm Equipment Company as defendants. The action was dismissed as to all defendants except Follett and Leach, Inc. on motions for summary judgment. A third party complaint of Follett and Leach, Inc. against Larry Wruck was dismissed on stipulation of the parties.

motion for judgment on the verdict. The plaintiff appealed to the court of appeals which certified the case to this court pursuant to section (rule) 809.61, Stats. 1981–82. The request for certification was granted.

On October 16, 1974, the plaintiff's father, Mr. Lawrence Burrows, accompanied by another son, Edward Burrows, purchased a 1949 Minneapolis-Moline corn picker for $250 from the defendant.[4] The defendant, which deals primarily in new farm equipment and feed, acquired the corn picker on a $200 trade-in from one Larry Wruck. Mr. Wruck had purchased the corn picker used in October of 1973 for $25 from Farm Auction Services, Inc. The defendant has never been a Minneapolis-Moline dealer. At the time of the sale, Follett and Leach offered new corn pickers which sold for about $2,000.

It is undisputed that at the time the corn picker was purchased by Burrows, the guard that covers the power take-off shaft was missing. There was conflicting testimony as to whether the missing guard was discussed by the parties at the time of the sale. Mr. Raymond Heller, the salesman for the defendant who sold the corn picker, testified that he was asked about the missing shield and said he had considered making one but did not know how. Edward Burrows testified that there was no discussion of a shield on the power take-off. Lawrence Burrows died before the case came to trial, but his deposition was read into the record wherein he stated that there was no discussion concerning the missing shield.

There was also conflicting evidence as to whether the plaintiff knew the guard was missing prior to the accident. At trial, the plaintiff testified that he did not notice that the power take-off shaft was unguarded prior to the time he used the corn picker. The defendant intro-

---

[4] There is confusion as to who actually negotiated the sale with the defendant. Lawrence Burrows' name appears on the bill of sale.

duced the plaintiff's deposition taken on June 5, 1978, in which he stated he noticed the shield was missing the first time he saw the machine when it was sitting in his father's yard.

Edward Burrows testified that he had used the corn picker prior to the plaintiff's accident and had observed that the shield was missing. The plaintiff's father stated in his deposition that he noticed the shield was missing at the time the corn picker was purchased.

Neither party attempted to purchase or construct a replacement for the missing guard. A witness for the defendant testified that his investigation subsequent to the initiation of this lawsuit revealed that a replacement for the missing shield had not been available from Minneapolis-Moline since 1973.

The accident occurred on October 27, 1974. The plaintiff testified at trial that he had no recollection of how the accident happened. His father and brother who were working nearby heard a rumbling noise and the tractor engine stop. They ran to the field where the plaintiff had been picking corn and found him entangled in the unguarded portion of the power take-off shaft. As a result of the accident, the plaintiff suffered serious injuries including the traumatic amputation of his lower right leg.

At trial, the plaintiff requested that the court instruct the jury on the defendant's liability under the doctrine of strict liability in tort. The court refused on the grounds that strict liability is inapplicable to sellers of used goods.

This court first recognized the rule of strict products liability in tort in the case of *Dippel v. Sciano*, 37 Wis. 2d 443, 155 N.W.2d 55 (1967). At that time the Court adopted the Restatement (Second) of Torts, sec. 402A which states:

"Sec. 402A.   *Special Liability of Seller of Product for Physical Harm to User or Consumer.*

"(1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a)  the seller is engaged in the business of selling such a product, and

"(b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2)  The rule stated in subsection (1) applies although

"(a)  the seller has exercised all possible care in the preparation and sale of his product, and

"(b)  the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In *Dippel,* this court stated the reasons for adopting the rule of strict liability in tort as follows:

"The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling.  He may pass the cost on to the consumer via increased prices.  He may protect himself either by purchasing insurance or by a form of self-insurance.  In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who creates the risk by placing the defective product on the market.  A correlative consideration, where the manufacturer is concerned, is that the manufacturer has the greatest ability to control the risk created by his product since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer."  37 Wis. 2d at 450–451.

The court emphasized that the rule of strict liability should not be misconstrued as a rule of absolute lia-

bility. "From the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts." 37 Wis. 2d at 460.

Since the *Dippel* case, sec. 402A has been used in a variety of fact situations. However, this Court has never endorsed the imposition of liability under sec. 402A against a seller of used goods.

A number of courts around the country have addressed the question of the applicability of sec. 402A to sellers of used goods. In *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex. Civ. App. 1975) the Texas Court of Appeals considered the question of the liability of a seller of used bricks under the theory of strict liability. The court noted that the literal language of sec. 402A applies to "any seller" and "[n]either the rule nor the commentary contains any language which can fairly be interpreted as making the rule applicable only to sellers of new products." 529 S.W.2d at 306. On that basis, the court upheld the applicability of the doctrine to sellers of used goods.

In *Turner v. International Harvester Co.,* 133 N.J. Super. 277, 336 A.2d 62 (1975), the plaintiff sued both the manufacturer and the seller of a used truck. The buyer had been killed when the truck cab, which had been raised to obtain access to the engine, fell on him. The court analyzed the applicability of sec. 402A to dealers in used goods in terms of what it considered the underlying policy of enterprise liability.

"To a considerable extent—with respect to *new* goods —the manufacturer bases the cost of his product on his expenses, which include damages caused by the product and insurance to cover those damages. This cost is spread among all the customers for that product; it re-

flects the justifiable expectations of customers regarding safety, quality and durability of new goods. Sellers of used goods may similarly distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods." 133 N.J. Super. at 288–289, 336 A.2d at 69.

The court noted that expectations of quality and durability will be lower for used goods commensurate with their age, appearance and price.

"However, safety of the general public demands that when a used motor vehicle, for example, is sold for use *as a serviceable motor vehicle* (and not as junk parts), absent special circumstances, the seller be responsible for safety defects whether known or unknown at time of sale, present while the machine was under his control. Otherwise, the buyer and the general public are bearing the enterprise liability stemming from introduction of the dangerously defective used vehicle onto the public highways." 133 N.J. Super. 336 A.2d at 69.

The Arizona Court of Appeals decided against strict liability for a seller of used auto parts in *Rix v. Reeves,* 23 Ariz. App. 243, 532 P.2d 185 (1975). In that case, the plaintiff was injured when the lock ring on a used truck wheel purchased from the defendant "exploded" off the wheel. In holding sec. 402A inapplicable to the facts of that case, the court said:

"We find no justification here for extending the strict liability in tort theory to the operator of an auto salvage yard when a tire rim of unknown age and use fails. The obvious ramifications of such a decision would extend beyond the dealers in used automobile parts to all sellers of used products in our state. Due to the nature of this type business (selling used, worn and sometimes obviously damaged products), it would seem to be a severe economic blow to force these dealers to inspect and repair parts before sale, warn of obvious dangers in using used parts, and to insure against possible liability for

injuries caused from their use." 23 Ariz. App. at 245, 532 P.2d at 187.

The court went on to say that "[a] reasonable buyer would not expect to pay a new rim price under such circumstances, and could not expect the quality and warranties available in the purchase of a new rim." 23 Ariz. App. at 245, 532 P.2d at 187.

The Supreme Court of Oregon analyzed the various policy factors favoring strict liability and concluded they did not apply to the seller of used goods in the case of *Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299 (1979). In *Tillman,* the plaintiff was injured when his hand became caught in the gears while greasing a twenty-four year old crane purchased used from a used equipment dealer. The plaintiff alleged that the crane was defectively designed in that it could not be properly greased without removing the protective gear covering and for failing to provide warnings of the danger.

The court in *Tillman* identified three justifications for the rule of strict liability for defective products: "Compensation (ability to spread the risk), satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product)." 286 Or. at 753–754, 747, 596 P.2d at 1303 (quoting *Fulbright v. Klamath Gas Co.,* 271 Or. 449, 460, 523 P.2d 316 (1975)). The court determined that in the case of used goods, only the first justification was fully applicable.

"While dealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured parties and the allocation of the cost of injuries caused by the products they sell, we are not convinced that the other two considerations . . . weigh sufficiently in this class of cases to justify imposing strict liability on sellers of used goods generally." 286 Or. at 754, 747, 596 P.2d at 1303.

As to whether any representation as to the safety of a used product was implied by its sale, the court said,

"[Used goods] markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion.)" 286 Or. at 755, 596 P.2d at 1303.

The court also concluded that any risk reduction that would be accomplished by imposing strict liability on dealers in used goods would be minimal. Dealers in used goods generally have no direct relationship with either manufacturers or distributors. Hence, there is no channel of communication by which the seller and manufacturer can exchange information on possible dangerous defects or actual liability claims. In theory, a dealer in used goods should be able to obtain indemnity from the manufacturer when injury results from a design or manufacturing defect. However, as a practical matter, the chances of indemnity are "diluted" in the case of used goods because of such problems as statutes of limitation and the increasing difficulty of locating an existing solvent manufacturer with the passage of time.

The court concluded that:

"[T]he relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, at least in the absence of some representation of quality beyond the sale itself or of a special position vis-a-vis the original manufacturer or others in the chain of original distribution." 286 Or. at 757, 596 P.2d at 1304.

There is an additional consideration in this case not present in *Tillman* which weighs against imposing strict liability. Defects which give rise to strict liability claims may generally be classified into two categories: design or manufacturing defects and defects which arise after the product leaves the manufacturer or original seller. The defect alleged in *Tillman* was of the first type. The defect alleged in this case is of the second type. There is no allegation that the power take-off shield was missing when the corn picker left the control of the manufacturer. Nor is there any allegation that the shield was removed while the corn picker was in the hands of the defendant.

This distinction is significant for two reasons. First, the risk prevention policy identified in *Tillman* loses all force in the case of defects that arise after the product leaves the original manufacturing and distribution chain. As noted in *Tillman*, imposition of liability for design or manufacturing defects serves as an incentive for manufacturers to improve the safety of the goods they produce. When the manufacturer was not responsible for the defect that caused the injury, that incentive is not present.

The second reason for not applying strict liability for defects that arise after the product has been manufactured and sold is that liability is then imposed on a party that has not created the risk. In *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill. 2d 17, 329 N.E.2d 785 (1975), the Supreme Court of Illinois considered the question of whether strict liability should be applicable to the seller of a used car that was missing two parts from the braking mechanism and had badly worn brake shoes. There was no allegation that the defects existed when the product left the control of the manufacturer or were created by the seller. The court stated that one

of the basic grounds supporting imposition of strict liability on manufacturers "is that losses should be borne by those who have created the risk and reaped the profit by placing the product in the stream of commerce." 61 Ill. 2d at 20, 329 N.E.2d at 786. Imposition of liability upon sellers is justified on the grounds that their position in the marketing process enables them to exert pressure on the manufacturer to improve the safety of the product. "A wholesaler or retailer who neither creates nor assumes the risk is entitled to indemnity. . . . Therefore, although liability is imposed upon anyone who is engaged in the business of selling the product, . . . the loss will ordinarily be ultimately borne by the party that created the risk." 61 Ill. 2d at 20–21, 329 N.E.2d at 787. That is not the case if liability is imposed on a seller of used goods for defects that arose while the product was in the hands of an unknown previous owner.

As noted in *Dippel*, one of the principal effects of the rule of strict liability is that it relieves the plaintiff of the burden of proving specific acts of negligence. Because design and manufacturing defects necessarily arise while the goods are under the exclusive control of the manufacturer, the manufacturer has access to information concerning possible negligence and the character and safety of the product not available to the consumer or user. To require a plaintiff to prove specific acts of negligence in such cases would, in many instances, impose an unreasonable burden. For that reason, it is equitable to relieve the injured consumer of the burden of proving negligence and to predicate the manufacturer's liability on his having placed an unreasonably dangerous, defective product into the stream of commerce.

We conclude that strict liability under sec. 402A is not appropriate in this case. First, the plaintiff does not contend that the defendant made any express representations as to the safety of the corn picker and we infer none from its sale. The machine was obviously old. The defendant was not a regular dealer in used Minneapolis-Moline equipment. The defendant was not in the business of buying used equipment but did accept used machinery on trade in. The defect was in plain view and in fact observed by the buyer, Lawrence Burrows, at the time the corn picker was purchased. The dangers of a rapidly rotating drive shaft are obvious and well-known.[5] Second, imposition of liability on this seller would not achieve any significant reduction of risk. Finally, in fact situations such as this, the policy of compensating persons injured by dangerous products is more equitably served by common law negligence rules. The defendant did not create the defect giving rise to the risk. The fact that the guard was missing was as apparent to the plaintiff as it was to the defendant. Under those circumstances, it is reasonable to require the plaintiff to prove that the defendant failed "to exercise ordinary care to refrain from any act which will cause foreseeable harm to another," *Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 46, 288 N.W.2d 95 (1980) and that the defendant's negligence was greater than any negligence that might be attributed to the plaintiff. We conclude, therefore, that under the facts of this case there was no error in the court's refusal to instruct the jury on strict liability.

---

[5] The operator's manual for the tractor the plaintiff was using at the time of the accident contained a number of warnings regarding the power take-off. A decal affixed to the tool box next to the seat on the tractor stated, "BE CAREFUL: stop power take-off before dismounting from tractor."

The plaintiff also argues that the trial court erred in refusing to permit him to make an offer of proof. Specifically, counsel for the plaintiff wished to question the plaintiff as to how he acquired certain information given to an insurance adjuster shortly after the accident.

It is evident from the record that the plaintiff was allowed to make his offer of proof though not in precisely the way he wished. Counsel asked permission to question the plaintiff out of the presence of the jury as to the source of his information. The court refused to permit the questioning but stated: "There is more than one way of going on your offer of proof. You can do it in your own words and your own statement and I'll take that as an offer of proof." Counsel then proceeded to summarize what the plaintiff would say if permitted to testify on the matter.

It is clear from our cases that the trial court was correct in its statement as to the means of making an offer of proof. In *State ex rel. Schlehlein v. Duris*, 54 Wis. 2d 34, 39, 194 N.W.2d 613 (1972), this Court stated: "In most instances the trial court should permit an offer either in question and answer form or by a statement of counsel, in the record, of what he believes the testimony should show." *See also, Milenkovic v. State*, 86 Wis. 2d 272, 284, 272 N.W.2d 320 (1978). Since an offer was both permitted and made, there was no error.

The plaintiff argues that a new trial should have been granted in the interest of justice on the grounds that the jury's apportionment of negligence is against the great weight of the evidence. A trial court may, in its discretion, order a new trial where the jury's verdict is contrary to the great weight and clear preponderance of the evidence. *Markey v. Hauck*, 73 Wis. 2d 165, 242 N.W.2d 914 (1976). On the record before us, we con-

clude that the trial court did not abuse its discretion in refusing to grant a new trial. The jury's finding of greater negligence on the part of the plaintiff is amply supported by the evidence.

The granting of a new trial by this court is governed by sec. 751.06, Stats. 1981–82. That section provides:

"**751.06 Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

In *Buel v. La Crosse Transit Co.*, 77 Wis. 2d 480, 253 N.W.2d 232 (1977), this Court interpreted the predecessor to sec. 751.06, Stats.[6] to mean:

"[T]he test of granting a new trial in the interests of justice is whether this court is convinced that there was a probable miscarriage of justice. In viewing the case as a whole, this court must be convinced to a reasonable certitude that if there were a new trial it would probably effect a different result. 77 Wis. 2d at 494 (quoting

---

[6] Chapter 187, sec. 76, Laws of 1977 amended and renumbered, sec. 251.09, Stats. as sec. 751.06. Section 251.09 reads:

"**251.09 Discretionary reversal.** In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not, and may also, in case of

*Benzschawel v. Stoll,* 64 Wis. 2d 211, 214–215, 218 N.W.2d 748 (1974).

Based on our reading of the record, we conclude that a new trial would probably not yield a different result.

The plaintiff also argues that the jury award of only $70,000 for Leonard Burrows' injuries renders the verdict perverse. This court has said:

> "The rule is that where a jury has answered other questions so as to determine that there is no liability on the part of the defendant, which finding is supported by credible evidence, the denial of damages or granting of inadequate damages to the plaintiff does not necessarily show prejudice or render the verdict perverse. . . ." *Hareng v. Blanke,* 90 Wis. 2d 158, 279 N.W.2d 437 (1979) (quoting *Dahl v. K-Mart,* 46 Wis. 2d 605, 613, 176 N.W.2d 342 (1970).

Finally, the plaintiff argues that a new trial should be granted on the grounds that four of the jurors were unduly influenced by the fact that they had participated in another personal injury trial several months earlier in which the counsel for the defendant and the plaintiff's expert witness had also participated. The plaintiff admits that these four jurors were questioned as to whether they could render an impartial verdict in *voir dire.* They all answered affirmatively and none were stricken. The plaintiff rests his argument that they were biased on the grounds that they awarded Leonard Burrows only $70,000 for his injuries.

Under the circumstances, the plaintiff waived any objection to the jurors on the grounds of bias. As stated

---

reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with the statutes governing legal procedure, as shall be deemed necessary to accomplish the ends of justice."

in *Osmundson v. Lang*, 233 Wis. 591, 290 N.W. 125 (1940), "The plaintiff [may] not sit by and after verdict accept the juror if the verdict is favorable and move to set aside the verdict if it was unfavorable." 233 Wis. at 594.

*By the Court.*—The judgment of the trial court is affirmed.