Jennifer Dee GEBOY, as the Personal Representative of the Estate of Randall L. Matezevich, and Gregory Lee Matezevich, by his Guardian, Jennifer Dee Geboy, and Northbrook Property & Casualty Insurance Company, Plaintiffs,

v.

TRL, INC., State Farm Fire and Casualty Company, WMW Machinery Company, Inc., IMTOE Industries, Inc., Industrial Plant Services, and Chalmers & Kubeck, Inc., Defendants.

and

TRL, INC., Third–Party Plaintiff,

v.

VEB GROSSDREHMASCHINENBAU "7 OKTOBER," VEB 7th Oktober Berlin, Niles Werkzeugmaschinenhandel GmbH Berlin, Fritz Werner & Niles Werkzeugmaschinenhandel AG, Niles Werkzeugmaschinenhandel GmbH, VEAB WMW Export/Import, Chalmers & Kubeck, Inc., Industrial Plant Services, Inc. Wemex Werkzeugmaschinenhandel, Third–Party Defendants.

No. 95–C–0618.

United States District Court,
E.D. Wisconsin.

Sept. 11, 1997.

Kenneth R. Baumgartner, Kenosha, WI, for Jennifer Geboy.

Mary L. Richards, Hogan, Ritter, Minix & Comeau, Milwaukee, WI, for Northbrook Property & Cas. Ins. Co.

Christopher J. Trebatoski, Paul E. Benson, Gordon P. Giampietro, Michael, Best & Friedrich, Milwaukee, WI, for TRL.

Russell M. Ware, Querry & Harrow, Ltd., Racine, WI, for State Farm Fire and Cas. Co.

Kenneth B. Ness, Terschan, Steinle & Ness, Milwaukee, WI, for WMW Machinery Co., Inc.

Samuel A. Nouhan, Frank Nizio, Bowman and Brooke, Detroit, MI, David R. Kelly, Bowman and Brooke, Minneapolis, MN, for IMTOE Industries, Inc.

Paul J. Pytlik, Jennifer A. Slater, Otjen, Van Ert, Stangle, Lieb & Weir, S.C., Milwaukee, WI, for Chalmers & Kubeck, Inc.

W. Wayne Siesennop, Jane F. Carrig, Hannan, Siesennop & Sullivan, Milwaukee, WI, for Industrial Plant Services.

## OPINION AND ORDER

CURRAN, District Judge.

On December 7, 1994, Randall L. Matezevich died as a result of an accident involving a twelve-foot vertical boring mill at the place of his employment Tabor Mining in the County of Racine, Wisconsin. The boring mill had been sold or brokered to Tabor Mining on October 31, 1991. Plaintiff Northbrook Property and Casualty Insurance Company is the worker's compensation carrier. The action is also brought by Jennifer D. Geboy, the personal representative of Matezevich's estate, and Gregory Lee Matezevich, his son, who was approximately two months old at the date of Matezevich's death. Jennifer D. Geboy is the mother of Gregory. All of the defendants who have been served have filed dispositive motions.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). Substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes over facts which are outcome determinative under the applicable substantive law will preclude the entry of summary judg-

ment. *Id.* The standard for deciding whether to grant summary judgment thus mirrors that for deciding whether to grant judgment as a matter of law pursuant to Rule 50(a). The district court must thus enter judgment if, under the governing law, a reasonable fact finder could not find for the nonmoving party. *Shields Enterprises. Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). The nonmovant must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must draw all inferences in a light most favorable to the nonmovant but may grant summary judgment when the record taken as a whole could not leave a rational trier of fact to find for the nonmoving party. *Griffin v. City of Milwaukee*, 74 F.3d 824, 826–27 (7th Cir.1996). Because jurisdiction in this case is predicated on diversity, the court will apply the substantive law of Wisconsin. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–23, 82 L.Ed. 1188 (1938).

### BACKGROUND

Despite extensive discovery, neither the manufacturer nor the date of manufacture of the vertical boring mill has been established. It appears likely that the mill was manufactured in the 1960's or early 1970's in East Germany. The mill was imported into the United States and in September, 1984, defendant Chalmers & Kubeck, Inc., purchased the mill in a disassembled condition from an entity known as Goldberg & Emmerman of Elk Grove Village, Illinois. Chalmers & Kubeck is in the business of manufacturing machined products for industry and anticipated using the mill in its manufacturing plant. After the purchase however, Chalmers & Kubeck acquired a different machine which better suited its purposes and the mill still in its unassembled condition was transferred to a warehouse in Lester, Pennsylvania, which was owned by Industrial Plant

Services. At the time Chalmers & Kubeck warehoused the mill, it allowed Industrial Plant Services to offer the machine for sale. According to the affidavit of John Kubeck, the president of Chalmers & Kubeck, Inc., buying machinery for resale or reselling used machinery for profit is not part of the regular business of Chalmers & Kubeck. The only time it is involved in the sale of used machinery is when it intends to dispose of machinery which is no longer needed for its manufacturing business. On those occasions Chalmers & Kubeck does not directly market its used machinery but employs outside vendors to find a buyer for the equipment. These occasions are rare.

Industrial Plant Services kept the disassembled mill in its warehouse for approximately one year until it was sold to Imtoe Industries on October 30, 1991, for $41,000.00 "as is" with "no warranty expressed or implied." At no time while the mill was in the possession of Industrial Plant Services was it ever operated or even assembled. According to the affidavit of Robert Joyce, a partner in the general partnership of Industrial Plant Services, there have been no other occasions in which Industrial Plant Services has sold any used machinery. Since the start of Industrial Plant Services in December, 1982, until this action was filed in 1995, the sale of the vertical boring mill was the only sale of used machinery by Industrial Plant Services.

Shortly before the vertical boring mill was sold to Imtoe Industries, John Tabor came to the Industrial Plant Services warehouse to inspect the machine. Tabor Mining arranged and paid for the shipping of the machine in its disassembled state from the Industrial Plant Services warehouse to Tabor Mining's plant in Wisconsin.

On October 30 and 31, 1991, Imtoe Industries bought and resold the vertical boring mill to TRL, Inc. The machine was still in its unassembled condition and Imtoe Industries sold the machine to TRL "as is, as inspected. Imtoe Industries, Inc., expresses no guarantee regarding machine being complete or operational."

Sometime in 1990, John Tabor, the owner of Tabor Mining and Manufacturing, decided to purchase a vertical boring mill. He first contacted TRL on June 6, 1991, and again on October 16, 1991. TRL located the machine through Imtoe Industries and sold it to Tabor Mining directly from the Industrial Plant Services warehouse in Pennsylvania. TRL never had physical custody, possession or control of the machine although it did finance the machine for Tabor Mining on a collateral basis. TRL thus retained ownership of the machine until the balance due plus interest was paid in full several months later.

Manuals, drawings and books related to the assembly and operation of the mill were included with the machine. Tabor Mining arranged for the transport of the mill and its setup. The machine remained in the possession of Tabor Mining until the date of the accident in 1994.

### WMW MACHINERY COMPANY, INC.

The Plaintiffs originally commenced this action in the Racine County Circuit Court against TRL and its insurer which was unknown at that time. TRL removed the case predicating jurisdiction on diversity, 28 U.S.C. § 1332. The Plaintiffs were given leave to amend their complaint in order to join WMW Machinery Company, Inc., as the designer and manufacturer of the vertical boring mill. WMW answered the complaint denying that it manufactured or designed the machine and on March 27, 1996, the court conducted a second scheduling conference but adjourned the conference in order to give counsel the opportunity to informally resolve the issue of whether WMW manufactured the milling machine. The Plaintiffs amended their complaint twice more; once to add Imtoe Industries and finally to add Industrial Plant Services and Chalmers & Kubeck. Meanwhile, TRL filed a third party complaint against the entities which it believed were the German manufacturers of the machine, the importer of the machine, Chalmers & Kubeck, and Industrial Plant Services.

WMW filed its motion for summary judgment but briefing was delayed in order to give the parties sufficient opportunity for discovery. The Plaintiffs executed a stipulation with WMW dismissing all claims against it. The court notified the parties that it would sign the order of dismissal unless objections were received. TRL objected to

dismissal. The court conducted yet another scheduling conference permitting the Plaintiff leave to file a third amended complaint asserting direct claims against Chalmers & Kubeck and Industrial Plant Services. TRL was further granted leave to supplement its opposition to WMW's summary judgment motion.

TRL employed the services of a German investigative agency in order to discover the mystery surrounding the manufacture and distribution of the vertical boring machine. The investigator, David John Cowling, submitted the following statement which was filed in support of TRL's supplemental brief in opposition to WMW's motion for summary judgment.

1. I am an adult resident of the Republic of Germany and a member of Argen GmbH, a German investigative agency, located at Kaiser–Wilhelm–Ring 18, 50672 Köin, Germany.

2. I have been engaged by the law firm of Michael, Best & Friedrich to determine what entities were involved in the chain of manufacture and distribution of a one-hundred forty-four inch (144') [sic] vertical boring machine, manufactured in or about 1965, with serial number 132107, and the logo "WMWNiles" (hereinafter, the "Machine"). Attorneys for Michael, Best & Friedrich have provided me with pictures and other information regarding Machine.

3. During the course of my investigation, I learned that a gentleman named Peter Klopsch ("Klopsch") could have information regarding the Machine. Klopsch is a retired, former employee of WMW–Niles in Berlin–Weissensee who began working at WMW–Niles in 1952. Until the reunification of Germany, the arm of WMW–Niles that was believed to be involved in manufacturing and distributing the Machine was an East German entity. I spoke to Klopsch by telephone on 20 December 1996 and described to him the Machine as per the description in the lawyer's (Michael, Best & Friedrich) letter to me of November 20th, 1996, i.e. "a twelve foot or one-hundred thirty-seven inch vertical boring machine." Klopsch informed me that WMW–Niles had not manufactured vertical boring machines and from the description given, I should contact Fred Dellheim ("Dellheim"), the former director of the Berlin Werkzeugmaschinenfabrik in Berlin–Marzahn, who would probably have personal knowledge on vertical boring machines manufactured and distributed to the United States.

4. On 20 December 1996, I wrote to Dellheim at his home address in the Franz–Stenzer StraBe 27 in 12679 Berlin. In the letter I enclosed photographs of the machine along with the description of the machine as given by the Lawyers. On 22nd December 1996, Dellheim wrote back to me and informed that the Machine was not a vertical boring machine but a carousel (or vertical) lathe manufactured by WMW–Niles in Berlin–Weissensee. A true and correct copy of Dellheim's letter is attached to this affidavit as Exhibit "A." The English translation of this letter is: *"Dear Mr. Cowling,*

*The machine shown in the photograph is not a boring machine but a carousel-lathe with—I think—a bench circumference of 2000 or 2500 millimeters (mm).*

*The model number would then be DKZ 2000 or DKZ 2500.*

*Manufacturer was the company:*

*Grossmaschinenbau 7. Oktober*

*now:*

*Niles Werkzeugmaschinen GmbH*

*Gehringstrasse 39*

*13088 Berlin*

*I recommend you take-up contact directly with this company.*

*Yours Sincerely*

*Fred Dellheim"*

5. On receiving Fred Dellheim's letter, I then wrote to Mr. Klopsch on 27 December 1996 at his home address in Germany which is the Pilgramer Strasse 167 in 12623 Berlin. In the letter I enclosed the same photographs and text which had been sent to Fred Dellheim.

6. On January 2nd, 1997, I received a telephone call from a gentleman named Klaus Behnke ("Behnke") of Niles Werkzeugmaschinen GmbH. Klopsch must have forwarded my letter to Behnke since during the course of our conversation, Behnke made reference to the letter I had written

to Klopsch. Behnke confirmed that the Machine depicted in the photographs was a carousel lathe (Karusselidrehmaschine) DKZ 4000 and was identical to the type manufactured by WMW–Niles in Berlin–Weissensee, East Germany, up until 1972 or 1973. Behnke also noted that the Machine would have been exported to North America from East Germany through a State-owned foreign trade entity known as VEB WMW Export/Import of Berlin. These statements were confirmed in a facsimile from Behnke to me on January 8, 1997. A true and correct copy of this facsimile from Behnke is attached hereto as Exhibit "B."

*"To: Mr. D. Cowling*

*Dear Mr. Cowling:*

*The machine depicted in the photographs is a carousel-lathe DKZ 4000, manufacturer NILES. We confirm that this machine was manufactured in Berlin and via WMW \* delivered to the USA.*

*The manufacture was terminated n 1973.*

*Unfortunately we can no longer establish the exact delivery date.*

*We hope to have helped you with these details and remain.*

*Yours Sincerely*

*K. Behnke"*

---

\* Author's note: With WMW, Behnke meant VEB WMW Export/Import of Berlin.

7. After receiving Behnke's fax of 8 January 1997, I telephone him on the same day. Verbally, Mr. Behnke further informed me that WMW–Niles is still repairing and modernizing carousel lathes originally manufactured during the 1972/73 period. Behnke could find no record of the Machine based upon the serial number given. Behnke added that WMW–Niles in Berlin had, until recently, been represented in North America by WMW Machinery Inc. of Nyack, N.J. but that this relationship had now been terminated.

8. Through research, I had determined that the successor corporation to VEB WMW Export/Import is Wemex Werkzeugmaschinenhandels GmbH ("Wemex").

9. I contacted Frau Dagmar Mattuschka ("Mattuschka") who is employed at Wemex. She began her employment with Wemex (the former VEB WMW Export/Import) in 1973. She stated that during the 1960's and 1970's VEB WMW Export/Import's North American representative was B. Elliott, Ltd. of Toronto, Canada which was headed by a German national named Erwin Fischer ("Fischer"). In 1983, B. Elliott was liquidated and Fischer moved to New Jersey to form WMW Machinery, Inc. with a Manfred Kuhnelt. Mattuschka also referred me to Mr. Wilhelm Jahn ("Jahn"), a former colleague of hers who joined VEB WMW Export/Import prior to 1973, and to Ronald Halama, an engineer responsible for North America sales during time period the Machine would have been built, as individuals with additional knowledge in this matter.

10. I spoke with Jahn on 7 January, 1997. Jahn is currently employed in the Berlin representative office of WMW Machinery, Inc. which is known as World–Machinery Company Deutschland ("WMCD") Handel GmbH located at Chaussee Strasse 111, 10115 Berlin, Germany. WMCD is the parent of WMW Machinery, Inc.

11. Jahn confirmed that B. Elliott, Ltd., was the representative office for VEB WMW Export/Import in the 1960's and 70's and that Halama would have additional information on this matter since he was the responsible Sales Engineer at WMW–Niles for North America and is still employed by WMW–Niles today.

12. On 14 January 1997, I attempted to reach Ronald Halama at WMW–Niles in Berlin–Weissensee. I was connected to a Mr. Quandt who introduced himself as the Sales Director of WMW–Niles. Mr. Quandt informed me that Ronald Halama's office hours had now been set to zero, meaning that Halama was virtually retired and could no longer act nor speak for or on behalf of WMW–Niles. All future enquiries regarding WMW–Niles products and Mr. Halama were to be forwarded to Mr. Quandt.

The problem with the Cowling affidavit is that it does not set forth facts which are in the personal knowledge of Mr. Cowling. TRL has concluded that the manufacturer of the machine was Grossmaschinenbau

7. Oktober, a company which is now known as Niles Werkzeugmaschinen GmbH a/k/a WMW–Niles. TRL next asserts that the machine would have been exported to North America through a German democratic republic-owned foreign trade entity known as VEB WMW Export/Import of Berlin, the successor to which is Wemex Werkzeugmaschinenhandels GmbH. TRL next states that during the 1960's and 1970's the North American representative of VEB WMW Export/Import of Berlin was a Canadian company named B. Elliott, Ltd. B. Elliott was eventually liquidated in approximately 1983, and its founder Erwin Fischer, a German national, moved the operation to New Jersey to form WMW Machinery, Inc., with Manfred Kuehnelt. WMW, however, has submitted the affidavit of Michael Carr, who has been the president of B. Elliott (Canada) Ltd. since September 1981 and has been an employee of B. Elliott since 1973. According to Mr. Carr, B. Elliott (Canada) Ltd. was founded in 1950 and owned by B. Elliott PLC/U.K. and was sold to a Japanese builder of machine tools, Matsuura Machinery Corporation, on January 1, 1988, at which time it changed his name to Elliott Machinery (Canada) Ltd. Elliott Machinery (Canada) Ltd. is still in the business of importing and selling machine tools in Canada and was not liquidated in 1983, as TRL maintains. Mr. Carr's affidavit further indicates that B. Elliott never represented any East German manufacturer of the type of machine involved in the Tabor mining accident and did not have any knowledge of B. Elliott ever selling any East German made machines of that type in Canada or the United States. Mr. Carr further states that Mr. Fischer was neither the founder of B. Elliott nor was he a German national but rather was born in Austria.

WMW has also submitted the affidavit of Maria Ferraro, a corporate searcher employed by a Canadian law firm, who has attached copies of the corporate records of B. Elliott (Canada) Ltd. establishing that the entity was incorporated in 1950 and underwent a change of name to Elliott Machinery (Canada) Ltd. in 1988 and amalgamated with Intercoma Machinery Corporation in 1989 to form Elliott Machinery (Canada) Ltd. and remains an active Canadian Corporation with a registered mailing address in Toronto, Ontario, Canada.

WMW has submitted the affidavit of Manfred Kuehnelt, the vice president of WMW Machinery Company, Inc., which establishes that WMW Machinery Company, Inc. was incorporated June 29, 1993, when it purchased certain of the assets, including the trademark "WMW" of WMW Machinery, Inc., a New Jersey corporation formerly known as GMW Machinery, Inc. GMW was incorporated on April 15, 1982, and changed its name to WMW Machinery, Inc. in 1986. When GMW incorporated in 1982, East Germany conducted its international trade of machine tools through an East German foreign trade agency called "WMW–Export–Import." GMW first had the right to sell East German machine tools in 1982, pursuant to a joint venture agreement between WMW – Export–Import and a Panamanian Company called Hemisphere Holding and Trading Corporation. The agreement expired in 1987 and GMW, which was then known as WMW Machinery, Inc., entered into a direct commercial sales agency contract with WMW–Export–Import for a term of three years.

Mr. Kuehnelt reviewed the records of all of the machine sales of GMW, WMW Machinery, Inc., WMW Machinery of New Jersey, Inc., and WMW Machinery Company, Inc. and found no record or reference of any kind to the vertical boring mill purchased by Tabor Mining or any other vertical boring mill except for a quotation which the Company gave to Tabor Mining in 1992 for a new motor for the subject machine. Tabor, however, did not ultimately purchase or otherwise obtain the motor from WMW.

As I previously stated, the standard for deciding whether to grant summary judgment mirrors the standard governing the granting of judgment as a matter of law pursuant to Rule 50(a). A scintilla of evidence to support the nonmoving party's position is insufficient to successfully oppose summary judgment. There must be sufficient credible evidence presented upon which a jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Matter of Wildman,* 859 F.2d 553,

557 (7th Cir.1988). Even resolving all inferences in favor of the nonmovants, the court must find that if faced with this evidence at trial the court would be compelled to enter judgment as a matter of law to WMW. There is simply insufficient evidence for the court to find that WMW is a successor corporation to either the manufacturer, importer or distributor of the subject machine.

## CHALMERS AND KUBECK, INC. AND INDUSTRIAL PLANT SERVICES

In *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court adopted section 402A of the Restatement (Second) of Torts and set forth the five conditions necessary to recovery under strict liability. They are "(1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it" *Id.* at 460, 155 N.W.2d at 63. In the case of Chalmers and Kubeck and Industrial Plant Services, the Plaintiffs have failed to establish that a triable issue of fact exists that these Defendants were engaged in the business of selling such a product. Chalmers and Kubeck only sold machines when it no longer needed them and, in the case of Industrial Plant Services, it had never before or since sold or brokered a machine. The Plaintiffs attempt to argue that Chalmers and Kubeck should be subject to strict product liability because it used this type of machine as part of its regular business. They further argue that Industrial Plant Services should be subject to liability because they were in the business of servicing and repairing machinery. It is an undisputed fact, however, that neither of these Defendants was in the business of selling machinery of this type. Chalmers and Kubeck bought the machine in a disassembled condition in order to use it in its manufacturing business and then later changed its mind. It never inspected the machine. It never assembled the machine. It simply stored the machine on the premises owned by Industrial Plant Services. It later gave Industrial Plant Services authority to try to sell the machine which it eventually did. Similarly, Industrial Plant Services never assembled the machine and eventually sold the machine to Imtoe Industries—the one and only instance of such a sale. The court accordingly finds that the Plaintiffs have failed to establish a triable issue of fact exists as to an element of their claim and these two Defendants will be granted summary judgment.

The negligence claims must also be dismissed as to these Defendants. The Plaintiffs maintain that the injuries to Randall Matezevich were the result of a design defect, i.e. that there was no guard to shield the rotating shaft of the machine. The Plaintiffs, however, have provided the court with no clear Wisconsin authority which would support the imposition of common law negligence liability on a broker or distributor of a machine to correct a manufacturing defect. Neither Chalmers and Kubeck or Industrial Plant Services assembled, inspected, or used the machine and the Plaintiffs have failed to establish that they had an affirmative duty to subsequent owners to do so under a negligence theory. These claims will also be dismissed.

## IMTOE AND TRL

The remaining Defendants, Imtoe Industries, Inc. and TRL, Inc. have urged the court to adopt the reasoning set forth in *Pelnar v. Rosen Systems, Inc.*, 964 F.Supp. 1277 (E.D.Wis.1997), a case decided under Wisconsin law. The plaintiff in *Pelnar* was injured while working a bending roll machine at his place of employment, Wm. Schaus & Sons. Schaus had purchased the used bending machine at an auction conducted by defendant Rosen Systems, Inc. Rosen had taken title to the machine for purposes of the auction only. Rosen mailed brochures to prospective customers describing the machine and others that were being offered for sale at the auction. The brochure noted that "all purchasers accept the items to be sold in

'as is,' 'where is,' condition." *Id.* at 1278. The bending machine was shipped to Schaus, at Schaus's expense, directly from the premises of the former owner. The machine was never on any premises owned by Rosen nor did Rosen service, rebuild, or modify the machine.

The district court relied upon *King v. Damiron Corp.*, 113 F.3d 93 (7th Cir.1997) in which the Seventh Circuit, applying the law of Connecticut, found that strict liability did not apply to a dealer of used vehicles. Connecticut had, like Wisconsin, adopted the Restatement (Second) of Torts § 402A but the state courts had not indicated whether they would hold a dealer of used equipment strictly liable in tort and, because the courts of other jurisdictions were split, the Seventh Circuit declined to expand liability on the facts of the case.

The *Pelnar* court considered the two cases in which Wisconsin court addressed the liability of sellers of used products, *Burrows v. Follett and Leach, Inc.*, 115 Wis.2d 272, 340 N.W.2d 485 (1983) and *Nelson v. Nelson Hardware. Inc.*, 160 Wis.2d 689, 467 N.W.2d 518 (1991). It concluded that the facts concerning the defendant auctioneer were closer to the facts in *Burrows* in which the court declined to impose liability than the facts in *Nelson* in which liability was imposed. In *Burrows* the plaintiff was injured after becoming caught in the unguarded power take-off shaft of a used corn picker his father had purchased from Follett. Follett, which was principally a new farm equipment dealer, had acquired the corn picker as a trade-in. At the time the plaintiff's father purchased the corn picker he noticed that the shield was missing. He did not attempt to purchase or to construct a replacement for the missing guard. There was testimony that a replacement for the missing guard had not been available from the manufacturer since 1973. Follett did not regularly deal in equipment manufactured by Minneapolis–Moline, the manufacturer of the corn picker. Follett made no express representations as to the safety of the used corn picker. The unguarded power takeoff shaft on the corn picker was an open and obvious defect.

In *Nelson,* the plaintiff's father purchased a used gun from the defendant hardware store which took used guns in trade when selling new guns and then later sold the used guns to the public. The 14 year old plaintiff injured his hand when the loaded shotgun fell butt first and discharged. The defendant moved for summary judgment, submitting the affidavit of the manager stating that an inspection had been made when the shotgun was taken in trade and that no defects were apparent. He also stated that he made no assertions or representations concerning the safety of the gun, although the counter affidavit of the father stated that "when he asked Mark Nelson 'whether or not [the gun] would be a good beginning gun for his boy ... meaning whether or not it was in good working order since it was a used shotgun,' to which question he averred he received an affirmative answer." *Nelson,* 160 Wis.2d at 689, 467 N.W.2d 518. The trial court relying on *Burrows* "flatly held, without exception or condition, that strict liability does not lie against a seller of a used product." *Id.* at 697, 467 N.W.2d 518. The Supreme Court concluded that *Burrows* did not preclude the imposition of strict liability merely because a dangerously defective product was a used product. The Court, however, limited its holding to the facts of the case "where the seller of the used product is in the business of selling as defined in section 402A and where the defective condition causing harm to the consumer or user arises out of the original manufacturing process."

The *Pelnar* court then examined two cases from other jurisdictions—one of which had been relied upon by the *Burrows'* court, *Tillman v. Vance Equipment Company*, 286 Or. 747, 596 P.2d 1299 (1979) and *Tauber–Arons Auctioneers Co. Inc. v. Perez,* 101 Cal.App. 3rd. 268, 161 Cal.Rptr. 789 (1980). Both cases concluded that "strict liability should not be imposed on dealers selling used goods absent some representation regarding the quality of the specific product." *Pelnar,* 964 F.Supp. at 1281. The *Pelnar* court found compelling factual similarities between the case before it and *Tauber–Arons,* namely that the plaintiffs suffered injuries while in the course of their employment, that the plaintiffs' employers purchased used machinery at an auction conducted by the defendants, that the defendants had been exclusively engaged for a number of years in the

business of auctioning off used machinery and equipment, including a wide variety of different types of machines manufactured by a large number of different manufacturers, that the defendants advertised their auctions via the mail, and that the defendants did not perform any maintenance or repair on any of the auctioned equipment and sold all equipment "as is." *Id.* at 1281. The court thus concluded that under Wisconsin law the requirements of section 402A were not satisfied in that the defendant was not "engaged in the business of selling such a product." *Id.* The defendant was not in the business of selling any particular product or product line but rather depended on the nature of the business from which it obtained its selection. The court concluded that the defendant qualified as an "occasional seller," as opposed to a seller in the business of selling a particular product. Having no "consistent connection with any particular manufacturer," the policy considerations of risk reduction, i.e. the encouragement to manufacture better and safer products, is not satisfied by imposing strict liability on an auctioneer.

 This court also concludes that TRL and Imtoe are not in the business of selling vertical boring mills. Neither entity had physical possession of the machine nor had they inspected it. The machine itself was sold to Tabor as is and as inspected by him. Both entities took title to the used equipment solely for the purpose of its resale. Neither entity sells a particular type of machine nor do they sell it on behalf of a particular manufacturer. Although the facts are somewhat unclear on this issue, it appears that title to the machine went from Chalmers and Kubeck to Industrial Plant Services to Imtoe Industries to TRL, Inc. and finally to Tabor within the period of two days. The machine was sold unassembled and no warranties were made that the machine was operational or even complete. Imtoe and TRL acted solely as brokers and as such cannot be found to be "engaged in the business of selling such a product" as required under section 402A.

 The *Pelnar* court further considered whether the Defendant owed a duty to the Plaintiff the breach of which could give rise to liability under a negligence theory. Relying on *Rolph v. EBI Companies,* 159 Wis.2d 518, 464 N.W.2d 667 (1991), the court found that the defendant had no duty to the plaintiff and was thus not subject to liability for negligence. The auction brochure advised potential buyers that all the machinery was being sold "as is" and thus the auctioneer had no duty to inspect or make safety modifications to the machines. In *Rolph* the Wisconsin Supreme Court held as a matter of law that a reconditioner of a used machine is not subject to strict liability in tort for defects on the machine. The court stated that the objective in the area of strict products liability is to impose "the risk of loss associated with the use of defective products on the party that created and assumed the risk, reaped the profit by placing it in the stream of commerce, impliedly represented that the product was safe and fit for use by placing it in the stream of commerce, and had the ability to implement procedures to avoid the distribution of defective products in the future." *Id.* at 529, 464 N.W.2d 667 citing *Kemp v. Miller,* 154 Wis.2d 538, 453 N.W.2d 872 (1990). The *Rolph* court further found that the reconditioner of the machine owed no duty under ordinary principles of negligence to the owner of the machine it reconditioned or to third parties to bring the machine into compliance with present day safety standards. *Id.* at 532, 464 N.W.2d 667.

 Where the facts giving rise to an alleged duty are undisputed, the question of the existence of the duty is one of law. *Rockweit v. Senecal,* 197 Wis.2d 409, 419, 541 N.W.2d 742, 747 (1995) quoting *Olson v. Ratzel,* 89 Wis.2d 227, 251–52, 278 N.W.2d 238, 250 (Ct.App.1979). "Every person owes to all others the duty to exercise ordinary care to guard against injury which may naturally flow as a reasonably probable and foreseeable consequence of his act." *Fitzgerald v. Ludwig,* 41 Wis.2d 635, 639, 165 N.W.2d 158, 160 (1969). Courts, however, may consider the following factors when determining whether imposing liability in a particular case is against public policy:

(1) The injury is too remote from the negligence; or

(2) The injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or

(3) In retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or

(4) Because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or

(5) Because allowance of recovery would be too likely to open the way for fraudulent claims; or

(6) Allowance of recovery would enter a field that has no sensible or just stopping point.

*Coffey v. Milwaukee,* 74 Wis.2d 526, 541, 247 N.W.2d 132 (1976).

In this case, as in *Rosen,* the court must find that public policy compels a finding that the brokers are not subject to liability. Allowance of recovery in this case would enter a field that has no sensible or just stopping point. A broker of used machinery who does not undertake to inspect the machine and who sells it "as is" with no warranties that the machine was operational or even complete cannot be said to have a duty to the ultimate purchaser. Accordingly,

IT IS ORDERED that the motions of the Defendants for summary judgment ARE GRANTED.

IT IS FURTHER ORDERED that the motions of State Farm to bifurcate, to stay, and for summary judgment ARE DENIED as moot.

IT IS FURTHER ORDERED that the motion of Defendant Imtoe to dismiss IS DENIED as moot.

IT IS FURTHER ORDERED that the Clerk enter final judgment in favor of the Defendants and against the Plaintiffs who take nothing.